## J. W. MERRITT v. THE STATE.

### No. 1567. Decided March 16, 1898.

**1. Murder—Evidence—Res Gestae—Acts and Declarations of Deceased.**

On a trial for murder, evidence to the effect that just before the killing deceased started to go to a blacksmith shop, stating at the time that he was going there to get or to draw water, was admissible as res gestae of his act, and was not liable to objection that the statement was made in the absence of defendant, since it is not shown that he was pursuing or seeking an encounter with defendant or that he went to said shop for any other than an innocent purpose.

**2. Same—Re-examination of a Witness as to Mob Law.**

Where, on cross-examination of a State's witness, defendant had attempted to show that the witness was one of a party who had undertaken to raise a mob to deal with defendant, it was competent for the State, upon a re-examination of said witness, and in rebuttal, to show by him that he was opposed to mob law and had always used his influence to prevent mobs.

**3. Acts and Declarations of Defendant's Wife.**

On a trial for murder, it was inadmissible to show, by a justice of the peace, that some seven or eight years prior to the homicide defendant's wife had filed with said justice a complaint charging her husband (the defendant) with an assault upon her in no manner connected with the homicide.

**4. Murder—Insanity—Cross-Examination of Witness as to What He Has Heard About Defendant's Insanity.**

On a trial for murder, where defendant had introduced testimony showing his insanity, and that it was of long standing, it was competent, on cross-examination of one of the witnessses who was a near neighbor of defendant, to prove that he (the witness) had never heard of defendant's being insane until after the homicide in question.

**5. Same—Delusion.**

It has long been recognized that delusion is a form of insanity, and monomania may operate as an excuse for a criminal act when the delusion is such that the person under its influence has a real and firm belief of some fact not true in itself, but which, if true, would excuse his act; as where the belief is that the party killed had an immediate design upon his life, and under that belief, the insane man kills in supposed self-defense. The rule now settled is, that if the delusion is of such character as to impair the mind of the person possessed thereof to such an extent that he was not able to discern the right or wrong of the particular act he was doing, and he was induced to do the particular act by the delusion, he would not be criminal.

**6. Same—Delusion and Fear of Mob Violence.**

Where it is claimed that the act was committed under the influence of a delusion, it is important that the exact facts and conditions and moving causes to such delusion be proved. As in the case in hand, where the delusion of defendant' was that a mob was after him to kill him, his acts and conduct in relation to such supposed mob, and his declarations that the deceased was at the head of the mob seeking to take his life, was legitimate evidence; and it was error to exclude testimony to the effect that he believed deceased was at the head of the mob.

**7. Wife as a Witness—Cross-examination of.**

Where a defendant has introduced his wife as a witness to prove certain facts, it is inadmissible, on cross-examination, for the State to elicit other and different facts not germane to her direct examination and prejudicial to defendant. The wife can not thus be used as a witness against her husband.

**8. Wife as a Witness—Impeachment of.**

Where a wife becomes a witness in behalf of her husband, it is not permissible to lay a predicate for her impeachment by matters about which she could not be cross-examined.

**9. Impeachment of a Witness.**

It is competent to impeach a witness by showing that he has been indicted for forgery.

**10. Insanity—Opinion of Medical Expert.**

On the issue of insanity, where it appeared that a medical expert had at one time been the family physician of defendant for a period of about ten years, but for the past several years he had only seen defendant casually once or twice, Held, this shows an acquaintance and knowledge on the part of the witness sufficient to authorize him to testify as to his opinion of defendant's sanity.

**11. Insanity—Nonexpert Opinion.**

On an issue of insanity, it was not competent for a deputy sheriff to testify that he had heard defendant testify as a witness in a certain case tried a few weeks before, and that he testified like a sane man.

**12. Murder—Insanity—Delusions—Charge of the Court.**

On a trial for murder, where the testimony tended to show that at the time of the homicide the defendant was overwhelmed with an insane delusion that deceased was the leader of a mob that was seeking his life, the charge of the court should make a direct application of the law to the facts, and the jury should have been in effect instructed, that if defendant was insane on that subject, and if, under the delusion, he was incapable of distinguishing between the right and the wrong of the particular act, and he believed that in slaying deceased he was preserving his own life from the mob, then he would not be criminally responsible; and if the jury so believed, that they should acquit him.

APPEAL from the District Court of Parker. Tried below before Hon. J. W. PATTERSON.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Joe Brown, by shooting him with a gun, on or about the 21st day of May, 1897.

On the trial of the case the killing was not denied, but in justification it was contended that defendant was insane on the subject of a mob seeking to kill him, and that he insanely believed that the deceased, Joe Brown, was constantly trying to organize a mob for that purpose. That a short time before the homicide defendant received certain "white-cap" notices, threatening his life, and upon the strength of this he had his wife, his son, and deceased placed under certain peace bonds. It was also contended that Joe Brown was trying to entice his wife away from him for improper purposes, and that about fifteen days before the killing tried to get her to submit to him. That these insults were communicated to defendant on Wednesday, and on the following Friday, at their first meeting, under the influence of fear and resentment, defendant killed the deceased.

*F. L. Hutchison* and *Harry W. Kuteman,* for appellant.—The court erred in permitting the State to prove on cross-examination of the witness, G. O. McCall, that seven or eight years before the homicide defendant's wife made complaint before him as justice of the peace in which she charged her husband with making an assault upon her with a gun.

In this case the act of killing was admitted by the defendant. There were only two issues as to the motive of the act: first, that the defend-

ant was insane in the belief that deceased was trying to organize a mob
to kill him; second, that deceased had insulted defendant's wife a short
time before the homicide, and that defendant slew him on the first meeting under the influence of passion arising therefrom. Under these circumstances, over the most earnest objections of counsel, the State was
permitted to prove to the jury that seven or eight years before the homicide Mrs. Merritt made a complaint against her husband, charging him
with assaulting her with a gun. This complaint was made in the absence of defendant. It was in no way his act or confession. It was as
much hearsay as if Mrs. Merritt had told the witness of the circumstances. If it was competent in this case to prove that, eight years before, defendant assaulted his wife with a gun, it certainly was improper
to permit it to be established by the statements and acts of Mrs. Merritt
or any one else, made and done during the absence of defendant. But
suppose there was no question about the manner in which this fact was
sought to be established, was it competent and a fit subject of inquiry
in this case to show that many years before he assaulted his wife with a
gun? Did it throw any light on the real issues of this case? Certainly
the State did not want to prove him insane. It did not tend to prove
sanity. Why then did the State insist upon getting all this before the
jury? Because of its mighty and improper effect upon an ordinary juryman. Because it could be argued that eight years ago, before any one
even suspected him of being insane, he attempted the life of his wife,
how much more likely was he to kill a man he had cause to dislike. We
respectfully submit to this court that the simple recital of this evidence
in a bill of exceptions does not appear so very material, but when it can
be shown that a man abused his wife, attempted to kill her, it arouses
in the ordinary man the strongest prejudices, and one can readily understand how, under the guiding influence of able counsel, the jury would
be deeply prejudiced against defendant for assaulting his wife in 1889,
although he is supposed to be on trial for an assault made in 1897 on
Joe Brown. If the State had a right to prove such things, the defendant has a right to explain them or disprove them.

The court erred in permitting the State to prove by the witness Hollified that he never heard of the defendant being crazy before he killed
deceased, because it was leading and in effect was hearsay. The evidence shows that this witness knew defendant well and lived in a few
miles of him for a year or two. Now, instead of getting facts from this
witness based upon his own observation, the State was permitted indirectly to prove that the neighbors did not consider defendant crazy or
this witness would have heard of it. It was the rankest kind of hearsay
evidence, and its effect upon a jury can not be properly measured.

The court erred in excluding the testimony of the witness Hollified,
that in the conversation with defendant, upon which he based his opinion as to his mental condition, defendant told him that deceased was at
the bottom of all his troubles and was trying to organize a mob and was
the leader of said mob. This witness was introduced by defendant for

the sole purpose of proving the execution of a certain "white-cap" notice. The State then made him its witness on the subject of defendant's mental condition, and the witness testified he had conversed with defendant, and from said conversations formed the opinion that defendant was not crazy.

The defendant then offered to prove that in the same conversations from which witness had formed his opinion on the subject of defendant's sanity, the defendant told him that deceased was at the bottom of all his troubles and the leader of the mob that he feared. This was excluded by the court, upon the theory that it was self-serving. We submit that this was error, because the very gist of the plea of insanity was that defendant believed Brown was trying to kill him with a mob, feared it night and day, and believed he was about to accomplish his purpose at the time of the shooting.

The court erred in excluding the testimony of witness Hollified that when defendant first found the threatening "white-cap" notices he claimed deceased had caused them to be written and was at the bottom of the whole thing.

The defendant then offered to prove by a number of witnesses, that in all his insane talk about a mob being after him defendant always claimed that deceased was heading the mob. Without making separate assignments for each of these witnesses, I call the court's attention to the excluded testimony of the witness Dick, also that of Henry Pope, also the testimony of Jasper N. Haney when defendant came into his office, and many other witnesses by whom defendant offered to prove the fact that defendant was insane on the particular subject of deceased being after him with a mob. This was the issue of insanity, and if defendant was insane to the extent that he believed the deceased was organizing a mob to kill him, and acting under this insane idea he slew the deceased, then he had the right to prove it by his acts and declarations. But when the court excluded this evidence it excluded all evidence of the particular insane fear which actuated the killing. All this testimony was only offered on the subject of defendant's peculiar insanity, not for the purpose of proving as a fact that Brown really was organizing a mob.

The court erred in permitting the State to prove on cross-examination of defendant's wife that she and defendant separated in Coryell County about fifteen years before, and in permitting the State to ask if he had not about twenty years before assaulted his son Bennett in Coryell County and put him in jail, and that she had consulted lawyers about a divorce while in Coryell County and at Mineral Wells, and to prove by said witness that she had made a complaint against her husband at Millsap, charging him with assaulting her with a gun, and that he had assaulted her with a gun about eight or nine years before the homicide.

We submit to the court that all the testimony was irrelevant, and could serve no purpose other than to prejudice the jury against defend-

ant. It is true the trial judge stated he withdrew all the evidence of assault on Bennett from the jury, but he should never have permitted such question to be asked. The objection was made to the question as shown in the bill, it was overruled, and after the witness had answered, the evidence was withdrawn from the jury. The object of the inquiry had been accomplished, namely, to attack the defendant's character and by such questions to put him on the defensive. And we ask this court to examine this record and see how persistently the counsel for the State sought to poison the minds of the jurors against the defendant by evidence wholly foreign to the issues of this case. Every provision of our law which guarantees a fair and impartial trial was trampled under foot, and everything that could be raked up for twenty years was paraded before the jury and rolled under the tongue of counsel as a sweet morsel.

The court erred in permitting the State to prove by the wife of defendant that in 1892 she employed an attorney at Weatherford to institute a divorce suit against defendant, and that she stated as grounds for a divorce that defendant called her a whore, a bitch, and other vile names, and that she did institute said divorce proceeding, and read from the said petition before the jury, and that she and her husband frequently quarreled and separated.

This evidence could subserve no legitimate purpose—was not only immaterial, but hearsay. If it was a fact that defendant called her vile names, there was a way to prove it, and not by what his wife told Stewart and what she alleged in her petition. But the whole thing is in keeping with a great deal more that was introduced solely to heap odium, on the defendant and to prevent him from getting a fair and impartial trial. So injurious was this evidence that defendant was compelled to go into this side issue and prove by the State's witnesses, Edwards and others, how it was that defendant unjustly accused his wife of infidelity and called her vile names. Edwards, the friend of Brown, told defendant in 1892 that his wife was looking for certain men, and defendant accused her of it and called her these names; and upon account of the same she sued for a divorce, whereupon Edwards went to her and admitted he told defendant such things about his wife, but that he only did it for a "joke;" whereupon the divorce suit was dismissed.

The court erred in permitting the State to impeach Mrs. Merritt on immaterial issues as is shown in bills of exceptions numbers 17 and 18.

The court erred in permitting the State to prove by Mrs. Berry that Mrs. Merritt would frequently come to her house and make complaints against the defendant that he had been treating her badly. Certainly this was hearsay; defendant was not present. The complaints of Mrs. Merritt may have been unfounded. But the judge says this was offered for the purpose of impeaching Mrs. Merritt. Was it competent for the State to prove in this case that defendant was mean to his wife? Was he being tried for that? If so, the defendant should have gone into the history of his family troubles for the last twenty years, and his trial would be still in progress. Then they must have been immaterial and

improper issues and as such were not subject to impeachment. As a matter of fact, no predicate was laid for this evidence, and it was therefore inadmissible even on the grounds of impeachment. We submit to the court that so much of this improper evidence was admitted that no one could possibly calculate its effect on the jury.

The court erred in permitting the witness Withers to give his opinion of defendant's mental condition at the time of the killing, when he wholly failed to show that he was competent to give an opinion, and had not conversed with him for seven years except on one occasion when they "passed" only a few words.

The court erred in permitting J. P. McConnell to give his expert opinion of defendant's mental condition, because he had not qualified as an expert, or that from observation he was qualified to give an opinion.

The court erred in permitting the State to prove that John Merritt had written a letter since the homicide to his uncle concerning the same, and in trying to show to the jury that John Merritt therein stated there was no defense in this case except insanity.

The court erred in excluding the testimony of W. W. White, that on Wednesday before the killing defendant informed said witness that he had just been on the mountain and saw his family, and that on the morning of the homicide defendant was greatly distressed about deceased's conduct to his wife, and then told said witness that deceased had broken up his family and that his wife had told him that deceased had again insulted her and had tried to get her on the bed with him and that he (defendant) believed deceased had accomplished his purpose.

Without any lengthy argument on this assignment, we call attention to the opinion of this court delivered in the case of Jones v. State, 38 Texas Crim. Rep., 87.

This evidence was not offered until the State by cross-examination of defendant's wife had made an issue on the truthfulness of the insults offered to her by deceased, and had in open court proposed to lay the predicate to impeach her on said issue of insults, and did prove certain acts and statements on her part which would tend to rebut the fact that Brown had insulted her and that she resisted his advances. That the State examined the defendant's wife for two hours Thursday evening, and during said examination claimed he wanted to consult with certain witnesses in order to impeach her. That the next morning counsel for the State resumed the examination of said witness at great length, and "clearly indicated by his examinations that he made an issue as to the truthfulness of said witness' statement about said insults," all of which is certified to by the trial judge in the bill of exceptions.

Defendant then offered to prove by the witness W. W. White that on Wednesday he met defendant and defendant stated that he had been to see his family. This was excluded. We contend it was very material, because it corroborated the testimony of Mrs. Merritt that her husband came to her home about Wednesday before the killing and she informed him of deceased's insulting conduct.

The defendant then offered to prove by said witness that on the morning of the killing defendant told him of the fact that Brown had again insulted his wife, and that she informed him of it the Wednesday before. This also was excluded. We contend that this evidence (and much other of a similar character which we were forbidden even to attempt to introduce) was admissible not only to corroborate Mrs. Merritt, but as original evidence to show that defendant had knowledge of the insults and believed her statements. The evidence showed that defendant was greatly disturbed at the time the statements were made to the witness. This is certainly fatal error in this case, and as the Court of Criminal Appeals seems to have so exhaustively reviewed the subject in the Jones case, we deem it unnecessary to do more than to refer the court to the opinion in that case and bill of exceptions number 15·in this.

We do not abandon the other errors pointed out in the motion for a new trial, but pray the court to consider them all, and to reverse this case in order that this man may obtain a fair and impartial trial.

*R. B. Hood,* County Attorney, *Albert Stevenson, Nat. P. Jackson,* and *Mann Trice,* Assistant Attorney-General, for the State, filed able arguments and briefs in the case, which, owing to the length of the same, the Reporter regrets his inability to publish.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years; hence this appeal.

In appellant's first bill of exceptions he complains that the court acted improperly in admitting the testimony of T. F. Harrison, to the effect that, just before the killing, Joe Brown was over with him on the platform at Milsap, and went from there over to the blacksmith shop, and in connection with his going, stated that he said he was going from there either to get some water or draw some water, witness was not certain which. The objection urged to this testimony was that the statement was made in the absence of the defendant. In our opinion what he said at the time of going over to the shop was a part of the res gestae of that act, and was admissible. But, if it be conceded that it was not, we fail to see how its admission could injure the appellant. There is no pretense anywhere in the record that deceased was pursuing Merritt or seeking an encounter with him. Nor is there any pretense that he went over to said shop for any other than an innocent purpose.

We also believe that it was admissible to show on the re-examination of the witness Harrison by the State that he was opposed to mob law, and had always used his influence to prevent mobs. This was in rebuttal of the attempt to show by this witness, on his cross-examination by the defendant, that he was one of a party who had undertaken to get up a mob to mob the defendant.

We fail to see how it was admissible to prove by the witness McCall that defendant's wife, seven or eight years before the homicide, had

made complaint before him as a justice of the peace, in which she charged her husband with making an assault on her. There was nothing in the case that rendered this testimony admissible, and it was of a character to prejudice appellant's case before the jury.

Under the peculiar circumstances of this case, in our opinion it was admissible to prove, on cross-examination by the State of the witness J. R. Hollified, "that he had never heard of defendant being insane until after the homicide." There was a great deal of testimony introduced by the defendant tending to show that appellant was insane, and that this insanity was of long standing. The witness Hollified was a near neighbor of the appellant, and it was competent to show by him that he had never heard of the defendant being insane until after the homicide, as tending to show on the part of the State that the defense relied on was of recent fabrication and origin.

By bills of exceptions numbers 8, 9, 11, 12, 13, and part of 15 appellant presents the question as to competentcy of evidence to show that Joe Brown was regarded by the defendant as being at the head of a mob to kill him. This testimony was offered by appellant, in connection with other testimony from a number of witnesses, tending to show his insanity; that such insanity was in the shape of a delusion that a mob was after him to kill him, and that Joe Brown was at the head of the mob. It extended over a number of years, and these bills of exception show that proof was made on a number of occasions that appellant talked to them (witnesses) about a mob being after him, and on such occasions he became intensely excited and beside himself, and that they pronounced him insane on the subject of believing that a mob was seeking his life. In connection with their testimony as to his conversation about the mob being after him, and his conduct and condition on such occasions, it was offered to be proved by them that he stated that Joe Brown was at the head of the mob, and that he was at the bottom of the attempt to mob him. As a specimen of this character of testimony, we will quote from bill of exceptions number 13 as follows: "While the witness Jasper N. Haney was on the stand, after he had testified that he had known defendant for several years, and that he had received a letter about two months before the homicide from defendant requesting him to send up a United States marshal, that he was about to be mobbed, and that four or five days after said letter was received defendant rushed into his (witness') law office greatly excited, and stated a mob was after him, and that they were going to kill him (defendant), and asked for protection; and after said witness had testified that in his opinion defendant was not sane on the question of a mob, and that he would kill any one he fancied connected therewith, and would not know it was wrong—counsel for defendant offered to prove by said witness that when defendant rushed into his office as above stated, and in the same conversation above stated, the defendant claimed that Joe Brown, deceased, was the leader of the mob, and had organized it for the purpose of killing him." This testimony, in which the witness named Joe

Brown as the leader of the mob, was excluded; and it will be seen, going through the statement of facts, that the court permitted the witnesses to testify as to all the facts of these conversations, leaving out the name of Joe Brown as the leader of the mob, merely referring to the leader of the mob as "a certain person." It has long been recognized that a delusion is a form of insanity. It is sometimes called "monomania;" that is, the subject may be sane on every other topic, but insane on some particular topic. Of course, it denotes an impairment or disease of the mental faculties which may more or less less affect the mind generally. We quote from Mr. Wharton on this subject (1 Whart. Cr. Law, sec. 37) : "The answer of the English judges on the special topic of delusion is as follows: 'The answer must, of course, depend on the nature of the delusion; but, making the same assumption as we did before, namely, that he labors under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if, under the influence of his delusion, he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defense, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.' To the same effect speaks Chief Justice Shaw: 'Monomania may operate as an excuse for a criminal act' when 'the delusion is such that the person under its influence has a real and firm belief of some fact not true in itself, but which, if it were true, would excuse his act; as where the belief is that the party killed had an immediate design upon his life, and under that belief the insane man kills in supposed self-defense. A common instance is where he fully believes that the act he is doing is done by the immediate command of God, and he acts under the delusive, but sincere, belief that what he is doing is by the command of a superior power, which supersedes all human laws and the laws of nature.' " We gather from the authorities that a delusion need not be confined, as was formerly held, to the delusive belief of a fact which, if true, would afford a justification. But if the delusion was of such a character as to impair the mind of the person possessed thereof, to such an extent that the person was not able to discern the right or wrong of the particular act he was doing, and was induced to commit the particular act by the delusion, he would not be a criminal. Mr. Bishop, after stating the rule about as Mr. Wharton does, supra, uses this language: "This branch of the doctrine should be cautiously received, for delusion of any kind is strongly indicative of a generally diseased mind, and doubtless sometimes, if not always, does in fact extend beyond the precise point we have supposed, whether perceptible to the casual eye or not." And he then proceeds to quote from Hadfield's cases. See 1 Bish. New Cr. Law, secs. 393, 394. See also Busw. on Insan., secs. 429, 430. Now, if delusion is a feature of insanity, and if

a person overcome with such delusion does an act while under its influence for which the law would not hold him amenable, it is important that the exact facts and conditions and moving cause to such delusion be proved. The delusion of appellant in this case was not solely that appellant believed a mob was in pursuit of him, but that that mob was led on by a particular individual—Brown, the deceased. If Brown did belong to the mob, there would be much greater reason afforded why, under the spell of the delusion, appellant should have slain him. If, according to appellant's conception, Brown did belong to the mob, much more, if he were the leader of the same, would it appear that appellant's act in slaying Brown was the result of his insane delusion. The court, however, seems to have concluded that the insane delusion could be proved, and a most important feature omitted therefrom. That is, according to the court's idea, it was entirely competent to prove that appellant was deluded as to a mob in pursuit of his life, but it could not be shown in connection therewith who composed the mob. In the view we take of this question, we fail to see of what avail all the proof offered by appellant concerning the mob in pursuit of his life would be to him, if he was not permitted to show who composed that mob. The very essence of appellant's delusion was that the mob was led on by the deceased, if, he, indeed, was not the entire mob, and that under such belief he slew him; yet we have seen from the bills of exception above stated that appellant was denied this proof. In our opinion, this was material error on the part of the court.

Appellant, by his bill of exceptions number 14, shows that he introduced his wife and proved certain facts by her. The bill further shows that on cross-examination the State was permitted to show other and different facts, not germane or pertinent to those elicited on direct examination. Some of these facts elicited on cross-examination were of a damaging character, and calculated to greatly prejudice appellant before the jury. This was independent testimony, and the use of the wife as a witness against the husband, which was not admissible. See Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202, and authorities cited. Nor was it permissible to lay the predicate by the wife of appellant as to matters about which she could not be cross-examined, in order to impeach her.

We believe that it was competent to impeach the witness White by showing that he had been indicted for forgery.

By bill of exceptions number 21 appellant objected to the testimony of Dr. Withers as an expert as to the sanity of appellant. The bill shows that Dr. Withers had been the family physician of defendant up to the year 1891, a period of ten years; that he had only seen appellant since that time once or twice, and then only casually. On this general statement he was permitted to give his opinion as to the sanity of appellant. We take it that the bill sufficiently shows an acquaintance and knowledge on the part of the witness to testify on that subject, but by

a fuller examination of the witness on this subject the difficulty will no doubt be obviated.

We do not believe that it was competent for the deputy sheriff, Mc-Connell, to testify that he heard the defendant testify in a certain case tried a few weeks before, and in that case he testified like a sane man.

No exception was reserved to the charge of the court on insanity, but in view of another trial we would observe that the charge of the court on this subject may be well enough as far as it goes, but it does not apply the law to the facts of the case. We think that the court should give the jury a charge on insanity as applicable to the facts proved. In this case appellant's proof tended to show that he was overwhelmed at the time of the homicide with an insane delusion that deceased was the leader of a mob that was seeking his life. If he was insane on that subject, and if, under that delusion, he was incapable of distinguishing right and wrong of the particular act he was doing, and he believed that in slaying Brown he was preserving his own life from the mob, then he was not criminally responsible, and the jury should be instructed, if they believe the homicide occurred under such circumstance, to acquit him. The judgment is reversed and the case remanded.

*Reversed and remanded.*