## A. P. STEWART V. THE STATE.

### No. 3815.   Decided December 11, 1907.

**1.—Murder—Evidence—Husband and Wife—Cross-Examination.**

On trial for murder where defendant's wife testified to insulting conduct by deceased to her, which she communicated to her husband, and that thereupon defendant sought deceased and killed him, it was error to permit the State on

cross-examination to interrogate the witness about new matter not related to her examination in chief, and thus attempt to force her to testify against her husband.

**2.—Same—Evidence—Insulting Conduct Towards Female Relative.**

On trial for murder where defendant's wife testified to the insulting conduct of the deceased upon which defendant acted in killing the deceased, the question was not whether her statement was in fact false or true, but the question was whether defendant believed it and acted upon it, and there was error in the action of the court in permitting the State to go out into matters not drawn out in the original examination of the wife and which had no connection with the reason or motive for the killing.

**3.—Same—Charge of Court—Manslaughter.**

On trial for murder where the evidence showed insulting language and conduct of the deceased towards the wife of defendant, the court erred in his charge in limiting the jury to the sudden passion happening at the time of the insult, as the question is not one of sudden passion, but depends upon the fact that the defendant was informed of such insult and that at the time of the killing his mind was incapable of cool reflection upon his first meeting with deceased.

**4.—Same—Self-Defense—Charge of Court.**

Where upon trial for murder the evidence showed that defendant sought deceased for an explanation of his insulting conduct towards defendant's wife, and when he approached deceased the latter ran, and the defendant gave chase and followed him up some distance, when deceased called for a gun which was brought to him, but which the deceased did not use, but sought refuge behind a State's witness, when defendant fired and killed deceased, saying that he would not have killed him if the gun had not been brought out to him, there was no self-defense in the case, although the question was a close one, and the court did not err in submitting a charge on self-defense.

**5.—Same—Manslaughter.**

See opinion for facts which are not held to be sufficient to sustain a verdict of murder in the second degree.

Appeal from the District Court of Young. Tried below before the Hon. A. H. Carrigan.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*C. W. Johnson* and *Kay & Akin,* for appellant.—It is settled by statute in this State that the wife can not be required to testify against her husband, and if the husband places the wife on the stand as a witness in his defense, her cross-examination by the State must be strictly confined to the examination in chief. She can not be impeached by collateral matters and can not testify against her husband on matters disconnected with her examination in chief. Code Crim. Proc., art. 735; Jones v. State, 51 Texas Crim. Rep., 472, 101 S. W. Rep., 995; Messer v. State, 43 Texas Crim. Rep., 97; Washington v. State, 17 Texas Crim. App., 197; Hoover v. State, 35 Texas Crim. Rep., 345; Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202; Creamer v. State, 34 Texas, 173; Greenwood v. State, 35 Texas, 587; Merritt v. State, 39 Texas Crim. Rep., 70; Johnson v. State, 28 Texas Crim. App., 26; Hamilton v. State, 36 Texas Crim. Rep., 375; Owen v. State, 7 Texas

Crim. App., 332; Bluman v. State, 33 Texas Crim. Rep., 43; Red v. State, 39 Texas Crim. Rep., 414.

When one is on trial for a homicide, the undisputed defense being insulting words and conduct toward a female relative, and where defendant's wife gave him the information on which he acted, it is immaterial whether the wife's story to the husband be true, provided he believed it in good faith, and the wife can not be impeached by testimony tending to show that the insult never in fact happened, unless such knowledge was brought home to defendant before he acted. Messer v. State, 63 S. W. Rep., 643; Jones v. State, 33 Texas Crim. Rep., 492; Merritt v. State, 39 Texas Crim. Rep., 70; Red v. State, 39 Texas Crim. Rep., 414; Gaines v. State, 38 Texas Crim. Rep., 202.

In a prosecution for homicide, where it is sought to reduce the offense to manslaughter because of insulting words and conduct of deceased toward a female relative, and where such insulting words and conduct did not take place in the presence of the accused, then the law does not require that the killing be "under the immediate influence of sudden passion." Up to the time of the first meeting the law provides no limit to the subsidence of the passion supposed to be engendered by the information received. Orman v. State, 22 Texas Crim. App., 604; Bays v. State, 50 Texas Crim. Rep., 548, 17 Texas Ct. Rep., 980; Eanes v. State, 10 Texas Crim. App., 421; Niland v. State, 19 Texas Crim. App., 166; Williams v. State, 24 Texas Crim. App., 637; Richardson v. State, 28 Texas Crim. App., 217.

Under the statutes of this State, making insulting words or conduct to a female relative of the slayer an adequate cause to reduce a murder to manslaughter, as applied to a case where the insult did not take place in the presence of the accused, one of the principal ingredients of ordinary manslaughter, that is, "that the passion must arise at the time of the killing and must not be the result of a former provocation," is not applicable, and article 594, which governs ordinary manslaughter, should not be given to the jury. Penal Code, art. 597, sub-div. 4; Niland v. State, 19 Texas Crim. App., 174–175; Whaley v. State, 9 Texas Crim. App., 306; Orman v. State, 22 Texas Crim. App., 604; Bays v. State, 50 Texas Crim. Rep., 545, 17 Texas Ct. Rep., 981; Eanes v. State, 10 Texas Crim. App., 421; Williams v. State, 24 Texas Crim. App., 637; Richardson v. State, 28 Texas Crim. App., 217.

Where deceased had made threats against one on trial for murder, and such threats had been communicated to the accused, and where the res gestæ introduced by the State shows that deceased, at the time of the killing, manifested an intention to execute the threat, then the killing was justified and the jury should have been told so by the court. Miles v. State, 18 Texas Crim. App., 171; Gonzales v. State, 28 Texas Crim. App., 135; Bonner v. State, 29 Texas Crim. App., 232; Ellis v. State, 30 Texas Crim. App., 604; Herrington v. State, 63 S. W. Rep., 57; Aiken v. State, 64 S. W. Rep., 57.

In a prosecution for murder where it is sought by the accused to re-

duce the offense to manslaughter, by reason of insulting words and conduct by deceased to a female relative, and such defense is proved and undisputed, and such insult did not happen. in presence of accused, but he is informed later thereof, he could slay the deceased at first meeting, though the provocation may have been long before and the passion need not be sudden. Orman v. State, 22 Texas Crim. App., 604; Bays v. State, 50 Texas Crim. Rep., 548, 17 Texas Ct. Rep., 981; Eanes v. State, 10 Texas Crim. App., 421; Niland v. State, 19 Texas Crim. App., 166; Williams v. State, 24 Texas Crim. App., 637; Richardson v. State, 28 Texas Crim. App., 217.

The testimony adduced by the State, on the trial, made a strong case of self-defense, and the defendant was entitled to have the issue submitted to the jury. Penal Code, Wilson's Statutes, art. 674; Meuly v. State, 26 Texas Crim. App., 302; Baltrip v. State, 30 Texas Crim. App., 549; Jones v. State, 33 Texas Crim. Rep., 495; West v. State, 2 Texas Crim. App., 476; Seeley v. State, 43 Texas Crim. Rep., 68; Stewart v. State, 40 Texas Crim. Rep., 650–1.

Having been informed by his wife of the assault, the defendant had the right to seek the deceased, and to arm himself, for defensive purpose, and if at the time of the homicide the defendant did nothing calculated to bring on a difficulty, his perfect right of self-defense was unimpaired, and he could slay the deceased if it reasonably appeared necessary, from his point of view, to protect himself from death or serious bodily injury. Shannon v. State, 35 Texas Crim. Rep., 2; Melton v. State, 47 Texas Crim. Rep., 451; 11 Texas Ct. Rep., 747; Nelson v. State, 48 Texas Crim. Rep., 274; 13 Texas Ct. Rep., 341; Leito v. State, 49 Texas Crim. Rep., 309; 15 Texas Ct. Rep., 338; Mitchell v. State, 49 Texas Crim. Rep., 535; 16 Texas Ct. Rep., 579.

*F. J. McCord,* Assistant Attorney-General; *P. A. Martin,* District Attorney, and *Miller & Dycus,* for the State.—On question of cross-examination of defendant's wife: Gaines v. State, 38 Texas Crim. Rep., 202, 42 S. W. Rep., 385; Jones v. State, 38 Texas Crim. Rep., 87, 40 S. W. Rep., 807; Hoover v. State, 35 Texas Crim. Rep., 342, 33 S. W. Rep., 337; Blumann v. State, 33 Texas Crim. Rep., 43, 26 S. W. Rep., 75; Hamilton v. State, 36 Texas Crim. Rep., 372, 37 S. W. Rep., 431; Merritt v. State, 39 Texas Crim. Rep., 70, 45 S. W. Rep., 21; Red v. State, 39 Texas Crim. Rep., 414, 46 S. W. Rep., 408; Goodall v. State, 47 S. W. Rep., 359. On question of self defense: Lander v. State, 19 Texas, 462; Weaver v. State, 19 Texas Crim. App., 547; Hinton v. State, 24 Texas, 454; Robbins v. State, 9 Texas Crim. App., 666; Jones v. State, 76 Ala., 8; People v. Westlake, 62 Calif., 303; Bush v. State, 40 Texas Crim. Rep., 539; Lynch v. State, 24 Texas Crim. App., 350.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree and given five years in the penitentiary as his punishment. The facts show that defendant and deceased had been

neighbors and friends for over twenty years, living in the same neighborhood. The State's case is in substance:

That on the 17th of January, 1907, appellant killed the deceased Rutherford. Mrs. Workman was the only eyewitness to the homicide, and testified that she, her husband, J. E. Workman, and their two childrn had just arrived in Young County from the Indian Territory and had bought some land from the deceased and moved out to it and unloaded their wagon, preparatory to erecting a temporary camp. Deceased had gone with them to the place of their camp for the purpose of repairing a fence between his, deceased, land and that purchased by the husband of witness. This camp was about three-fourths of a mile northwest of the home of deceased and about seventy-five yards west of witness' east fence. This fence marked the boundary between witness' land and that of deceased. Deceased left the camp and went to the southeast corner of witness' land and she went about arranging her household matters, her husband busying himself by fixing the fence on the north and east of the camp. After her husband had finished this job, he returned to the camp and with his wagon started in a westerly direction to haul some water to the camp. Just at this juncture the witness' attention was attracted by hearing some one holloing, "Hey! Hey! Hey!" She turned and called her husband and sent her little girl for him, then looking east she saw deceased running in her direction and holloing to the witness, "For God's sake, bring me a gun." She ran to the other side of her camp, picked up an automatic shotgun and a breech-loading shotgun and started to the deceased with both guns and as she started she saw appellant for the first time, who was also running towards the camp. Witness saw no weapons in appellant's hands at that time; the men were not running from the same direction, appellant being north of deceased. Witness here made a map and gave it to the jury which showed the appellant and deceased were both approaching the camp, their line of approach being to a common center, leaving the tracks, as in the diagram, as they approached the camp in the shape of the letter "V." The map indicates that the horse of appellant was hitched to the fence above the gate and that appellant apparently came from the gate towards the camp. The distance from the gate and where the horse was hitched to the fence was not given, but it formed the opening part of the letter "V," the point of it being at the point of contact between the parties. Witness ran to the deceased with the two guns; deceased ran up to witness, threw his arms about her and held witness between himself and appellant. Witness was still holding the guns in her hand between her body and the deceased when appellant began firing with a pistol over the witness' head and shoulder at the deceased. Deceased was struggling to keep witness between appellant and himself and was moving around for this purpose. It threw deceased facing appellant with witness' back to appellant; deceased stooped in his efforts to keep the witness between himself and appellant, and after being wounded sank to his knees and turned witness loose and the firing

ceased. Up to this time not a word had been spoken by any of the parties, except when the deceased called to the witness to bring the gun. While on his knees after being shot, deceased reached out his hand and said to appellant, "forgive me." Appellant came up and they shook hands. The deceased then said to witness: "Pray for me," and asked for water. When witness returned with the water, deceased was lying on the ground and by this time the husband and son had arrived. The deceased never spoke after his request for prayer and water, and lived but a few moments. Appellant was asked, "What on earth did you do this for?" He replied that deceased had done him the dirtiest crime that one man ever did to another. At the time witness first saw the parties they were inside of her husband's enclosure about half way between the camp and the fence. This would seem to indicate that the fence was probably seventy-five or a hundred yards from the camp. Deceased was a large man of heavy build, strong and healthy.

The husband, J. E. Workman, testified about their moving to the camp and stated that his son had been at the gate, working on the fence just southeast of the camp. Witness had made repairs on the fence just north of the camp. While working on the fence, witness saw a man riding on the prairie, on a bay horse, some three hundred yards southeast of where witness was at work. The man stopped, looked towards witness' camp and then turned southeast toward a little field and rode out of sight. He finished his work, went to the camp, got some vessels, put them in his wagon and went off west in a trot to haul water to camp. After witness had gone two or three hundred yards, he heard his wife and little daughter screaming and holloing "Fire," saw his little daughter coming toward him, turned his team around and drove rapidly back. Arriving at the camp he saw appellant standing about ten feet from his wife; did not see deceased at that time; appellant had a pistol in his hand and was probably loading it or extracting shells. Witness then saw a man lying on the ground and said, "Who shot him?" Appellant said, "I shot him." Appellant pointed to the guns and said, "Look there, see those guns?" I had to shoot him, I would not have shot him if she had not brought those guns." Witness then turned deceased over and discovered it was Rutherford and remarked, "What on earth is the matter? I thought you and Mr. Rutherford were the very best of friends." Appellant replied, "We have been close neighbors for the past twenty years, but he has done me the dirtiest crime that one man could do another." Appellant was pale and excited. Witness afterwards found deceased's horse near the southeast corner of witness' place near the fence, and witness said that appellant had told him that he had gone to deceased to talk to him about it, and that deceased would not talk to him, and that deceased wanted to settle it with the guns. Witness did not tell this at the examining trial. Witness said to appellant, "I certainly hate this," and appellant said, "You do not hate it half as bad as I do. I would not have shot him if she had not brought those guns."

There are some other details in regard to facts that may be necessary

to state in the illustration of some questions. The defendant introduced his wife; her testimony is to the effect that on the morning prior to the homicide in the evening, that she was at her home upstairs; that defendant came into the house looking for her; came upstairs and found her crying and urged that she tell him the cause. That she then related to the defendant the following: "That on the afternoon of July 6, 1906, witness went to the mail box to get the mail. Witness did not look at the clock, but thought it was between 3 and 4 in the afternoon. That just as witness reached the fence near the mail box she heard deceased say: 'Wait, Mrs. Stewart, I'll get your mail for you.' Deceased then got the mail for witness and handed it to her over the fence, deceased being at that time in the road. Witness then took the mail. She was riding a boy's saddle and sideways. She then turned her horse around to go home. After turning around toward home she stopped her horse because there was a considerable quantity of the mail and she desired to tie the mail on the saddle. While tying the mail on the saddle deceased pushed down the wire fence and stood on it and led his horse across the wire, and came up behind witness and asked if he might go part of the way home with witness and at the same time took hold of witness with both arms around the waist and dragged witness off her horse and drew witness up to his breast. Witness said, 'Mr. Rutherford, you are seeking trouble,' and tried to push loose from him. Deceased said, 'No, I am not seeking trouble, but one wife is not enough for me and I want to borrow Pick Stewart's wife awhile.' Witness then said that if deceased did not turn her loose that she would scream. Witness was struggling all the time deceased held her. Deceased said, 'What are you going to do about it?' Witness said, 'I am going to tell Pick (appellant) just as soon as I can find him.' Deceased then said, 'Don't you dare do it' (pointing his finger at witness). Witness said, 'I will tell him as soon as he gets home.' Deceased then said, 'Don't you do it, I will be ready for him. If he can get a gun any quicker than I can, he is welcome to use it.' Witness then started to get on her horse and deceased asked if he might help her. Witness told deceased that he must not touch her again. Deceased then went off through the fence like he had come in." This was detailed as the matter which she had related to her husband on the morning of the day of the homicide.

The State then took her up on cross-examination rather fully and rigidly, asking many questions as to why she hadn't told her husband prior to the 17th of January when this thing should have occurred on the 6th day of July previous. The matters developed on cross-examination may be more fully stated in disposing of a bill of exceptions later. The State's cross-examination of appellant's wife took a wide range, mainly for the purpose of discrediting the truth of her statement as to the insult and indignity and inferentially to discredit the truth of the statement that she had told her husband on the morning prior to the homicide. Several grounds of objection were urged, among others, that she could not be forced to give evidence against her husband, on

matters pertaining to him in regard to the trial and to discredit the truth of the statement on immaterial matters, which did not tend to discredit the truth of the statement she made to her husband; and that this cross-examination was with reference to collateral matters, immaterial to the case, and around which necessarily a fierce contest would be waged, and if determined against the truth of her statement made to defendant, her husband's rights and attitude before the jury would be greatly and unjustly imperiled and impaired. All these objections, and others that are not here stated, were overruled, and the State was permitted to ask questions suggesting a private interview at the 4th of July celebration, between the deceased and appellant's wife, which was denied by her and she stated that the only conversation she had with deceased was in a crowd in the presence of her niece, when she asked him about the tournament then going on at the gathering, in which Boyd Street was trying to keep the people back out of the way. She was also asked if she had invited the deceased, over the phone, to come over and have soup, and witness answered that she had invited the family to dinner, which was long before the outrage perpetrated by the deceased. She was asked if she had in any way encouraged the deceased, which the witness denied; she was asked if the ground five or six hundred yards east of the place of the alleged indignity was not thick with brush and grass and obscure from view from the road. Witness said she did not know. Further, she was required to answer that appellant, her husband, had begun to sell his land and had sold five or six hundred acres of it after the 6th of July. She was further made to testify as to the appearance and demeanor of defendant and what it was after she told him of the insult, stating among other things that he said nothing, but sat with his head in his hands and that he went to the table but did not eat anything except perhaps drink a cup of coffee. That appellant left home sometime in the afternoon, but witness did not see him leave. She was required to testify, further, that appellant had several guns and pistols at different times and told where he kept them. Parts of this testimony elicited by the State on the cross-examination was not admissible through the mouth of the wife as against her accused husband. It has been held that a wife testifying in behalf of her husband, may be legitimately cross-examined in regard to matters about which she has testified, but it has not been held, so far as we are aware, that the State can depart from the line of investigation elicited from the wife by her husband, and interrogate about new matter, for this would be making the wife a State's witness. This would be true, even if the witness were not the wife of the accused. Wherever one side places a witness upon the stand and elicits evidence, the other side crosses upon it and then goes out into new matter, the witness, as to the new matter, becomes the witness of the party eliciting it. As to the ordinary witness, the party would have a legal right to do this, provided the subject of investigation was legitimate, but this rule does not apply to the wife. See Jones v. State, 38 Texas Crim. Rep., 87. There are matters here which

are clearly not within the legitimate sphere of cross-examination. For instance, the wife was forced to testify against her husband that after the 6th of July he was selling land and had sold some five or six hundred acres of it with a view of moving away, and that he had arms, guns and pistols, at different times about his place and other matters that are unnecessary to detail. On cross-examination of the wife, the State will be held to matters brought out in chief. See Code Crim. Proc., art. 735;Jones v. State, 51 Texas Crim. Rep., 472, 101 S. W. Rep., 995 (Rehearing opinion) ; Messer v. State, 43 Texas Crim. Rep., 97 ; Washington v. State, 17 Texas Crim. App., 197; Hoover v. State, 35 Texas Crim. Rep., 345; Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 216; Creamer v. State, 34 Texas, 173; Greenwood v. State, 35 Texas, 587; Merritt v. State, 39 Texas Crim. Rep., 70; Johnson v. State, 28 Texas Crim. App., 26; Hamilton v. State, 36 Texas Crim. Rep., 375; Owen v. State, 7 Texas Crim. App., 332; Red v. State, 39 Texas Crim. Rep., 414; Bluman v. State, 33 Texas Crim. Rep., 64.

The theory of the appellant, as made by his wife's testimony, and she seems to be the only one that throws any light upon the motive or the reason for this killing, was that he believed his wife's story about the matter; had no reason to disbelieve it, and if her testimony was to be discredited it could only be, if even to that extent, that she never made such statement to him. We believe this contention is correct. If she made this statement to appellant and he believed it and acted upon it, to him it was true, whether in fact it was false or true. That the insulting conduct towards appellant's wife in this case was the real cause, cannot be the subject of doubt from reading this record. These parties had been neighbors for twenty years or more, on friendly terms and there was no occasion and none is shown, why there should have been any difference between them, except as shown by the testimony of appellant's wife. And if in fact her statement to him was untrue, that information was never conveyed to him and in fact no one can read this record and come to any legitimate conclusion other than that it was true; but if it was a mistake, his defensive matter against murder and in favor of manslaughter was just as strong. As was said in Jones v. State, 33 Texas Crim. Rep., 492: "If the insulting conduct towards Mrs. Jones by Veal was the real cause of the homicide, or there was a reasonable doubt of that fact, and the killing occurred at the first meeting after the accused had been informed of such conduct, and, at the time of the killing, appellant's mind was in such a state of anger, rage, or resentment, as to render it incapable of cool reflection, then his offense would be of no higher grade than manslaughter. This would be the case although such insulting conduct had never occurred, provided appellant actually believed it had. The homicide on the trial must be viewed from the standpoint of the accused. The facts and circumstances should be analyzed and passed upon as they were reviewed by him at the time he acted upon them. If, in this case, appellant believed the insulting conduct communicated to him by his wife, actually occurred as de-

tailed by her, then to his mind such conduct was a reality, and the charge should have been so framed as to submit this important issue to the jury. Men often act upon the most important affairs and interests in life upon the mistakes of fact. They often risk honor, reputation, fortune and life upon mistakes of fact; of course, believing at the time they are not mistaken. The guilt of the accused party, in such state of case, should not depend upon the existence or non-existence of the fact itself, but upon the circumstances as they appeared to and were understood by him at the time of his acting upon them. Such questions are matters of fact to be solved by the jury under appropriate instructions. That the insulting conduct had or had not occurred would have been immaterial if she had so informed Jones, and he believed her. If the jury should believe that Mrs. Jones informed her husband of the conduct of deceased towards her and that his passions were thereby aroused to the extent of rendering his mind incapable of cool reflection, and that, while his mind was thus inflamed, he shot and killed Veal upon first meeting with him after receiving such information, his offense would be of no higher grade than manslaughter."

That the above extract correctly states the law under the circumstances, as detailed in this record, would not admit of a doubt at this date in Texas. We think there was error in the action of the court in permitting the State to go out into matters not drawn out in the original examination of the wife. The State offered to, and did prove, over appellant's objection by Mrs. John Steen, that in the month of August, 1906, defendant inquired of her whether she had seen anybody on the first day they threshed wheat that came out of his, appellant's, pasture and stated to her that he had seen where someone on that day had crossed his fence. The witness told appellant that she had not seen any person and did not know who had interfered with his fence. Many grounds of objection are stated here, which are unnecessary to repeat. The State also permitted John Steen, husband of the former witness, to state that sometime after July 6, 1906, appellant inquired of him whether he knew who had been in his, appellant's, pasture that day, that he had seen horse tracks crossing his fence and seemed like the tracks had come back into Steen's pasture, and Steen told appellant he had not seen any party and did not know. Various objections are urged to this testimony. What this had to do with the case we do not understand. Under the ruling of this court in Gaines v. State, 38 Texas Crim. Rep., this testimony was inadmissible. See also State v. Jones, 90 N. C., 702. There is nothing to connect this testimony with the reason or motive for the killing. There is nothing to indicate that appellant had ever suspected anything wrong between deceased and his wife so far as we can ascertain, and there is no fact in this whole record which indicates that there was a meeting between deceased and appellant's wife, except the one she details, and she testifies positively that she had not returned to that pasture since the unfortunate 6th of July, and she states as a reason why she did not tell her husband prior to the time she did

inform him, was that deceased had threatened to take her husband's life if she did inform him. This testimony from the Steens' was clearly inadmissible. This disposes of some other matters in regard to the introduction of testimony without going into a further discussion of them.

Error is assigned upon the charge on manslaughter, and especially that portion of it which informs the jury that the passion must not be the result of a former provocation, and that manslaughter is the voluntary homicide committed under the immediate influence of sudden passion; that the passion must arise at the time of the killing. And further, the court charged the jury if they "found at the time of the killing, the defendant was actuated by sudden passion, such as rendered his mind incapable of cool reflection, arising from his belief in good faith of the information so given him by his wife, then you will find the defendant guilty of manslaughter."

These are grouped without going into a separate discussion of them. These matters are mainly statutory, but as has often been held do not apply where the facts are like those contained in this record. In regard to insulting conduct toward a female relative the statute provides that it is adequate cause if the passion be engendered thereby, if the killing occurs on the happening of the insulting conduct or as soon as the parties may meet after the slayer has been informed of such insulting language or conduct. Now, appellant was not present when the insulting conduct happened, so he comes within the second clause,—the killing must occur at the first meeting after being informed of these matters,— and he would be entitled to a verdict for manslaughter if he was actuated by such passion as rendered his mind incapable of cool reflection. The time elapsing between the happening of the insulting conduct and meeting with the party giving the insult, has nothing to do with the suddenness of the passion. And the court's limiting the jury to the sudden passion happening at the time of the insult is a fatal error, under our authorities wherever that question has been discussed, as applied to the facts of this case so far as we are aware. The court was not entirely harmonious, perhaps, in the Orman case in the 22 Texas Crim. App., on one phase of the question, as we understand it, but were on the main proposition, because Judge White and Judge Willson, who disagreed with some of the observations of Judge Hurt in that case, have emphatically written the other way in cases, and some of them occurring subsequent to the Orman case. Wherever the insulting conduct is relied upon to reduce the killing to manslaughter, and the information is conveyed to the slaying relative, the question is not one of suddenness of passion, but it depends, first, upon the fact that he was so informed; and, second, that at the time of the killing his mind was incapable of cool reflection; that is, the condition of his mind as to its incapacity for cool reflection is not relegated to that portion of the statute which requires it to be sudden, for that only applies where the killing occurs upon the happening of the event. Without going further into this question, we cite in support of this: Bays v. State, 50 Texas Crim.

Rep., 548, 17 Texas Ct. Rep., 981; Eanes v. State, 10 Texas Crim. App., 421; Niland v. State, 19 Texas Crim. App., 166; Williams v. State, 24 Texas Crim. App., 637; Richardson v. State, 28 Texas Crim. App., 217; Martin v. State, 40 Texas Crim. Rep., 665; and Whaley v. State, 9 Texas Crim. App., 306.

It is contended that the law of self-defense should have been given. The cases are on a remarkably close line in regard to this matter, but we are inclined to the opinion, under our authorities, that the question under the facts stated is not presented. The only eyewitness testifies that her attention was called to deceased by his calling for a gun. Looking up she observed him coming rapidly in the direction of her camp; she obtained two guns and went meeting him with the guns. As she approached the deceased with the guns, she observed appellant coming in the direction of the deceased, but at the time without visibly having arms. Of course, the movements were very rapid, and when he reached the deceased and the witness, he had his pistol and began firing, and continued until the deceased fell to his knees. As this matter is presented, it puts appellant rather in the attitude of chasing the deceased to prevent him getting to the camp to arm himself. It is true that he stated at the time that he would not have killed deceased but for the fact that the witness brought the guns, yet, it would seem that he was rather chasing or pursuing the man he so shortly slew. As has been said by this court, self-defense is a defensive and not an aggressive act. The facts of this particular point are very unsatisfactory indeed. He had the right to approach the deceased and talk with him about this matter and to go armed against an anticipated assault by the deceased as he had threatened to make, and if the deceased made the assault or attempt to take his life, appellant did not forfeit his right of self-defense. See Shannon v. State, 35 Texas Crim. Rep., 2.

It is made to appear that appellant stated that he approached the deceased in order to talk with him. If the chase began from that point, and deceased holloed for a gun and appellant followed him up, it would not present self-defense. That deceased was very much excited is shown by all the evidence bearing upon his condition at the time of the homicide. We are of opinion that the testimony is hardly sufficient to suggest the theory of self-defense, although it is a very close question. The facts upon another trial may be brought out more fully. In regard to the sufficiency of the evidence we wish to say that the State's theory that this killing may have occurred for some other reason than that imputed, or testified by the wife, has, in our opinion, no standing in this record. That the parties had been friends through twenty years or more is thoroughly established; that they had been neighbors and interchanged visits and that up to the 6th of July there had been no break in the harmony, and so far as appellant was concerned, he never knew of that occurrence until the 17th of the following January. Deceased had not been to appellant's house after the 6th of July. The impartial mind, in our judgment, can take the scene and the occurrences at the time of

the homicide and reach no other conclusion from the acts and utterances of the parties at the time, than that the insult to Mrs. Stewart was the foundation for the killing. When appellant had shot his antagonist to his knees, that antagonist, facing the awful solemnity of impending death, reached out his hand to his slaying adversary with the request for forgiveness, and the friend of the twenty years preceding, even then, under those circumstances, extended that hand in forgiveness. Having obtained this forgiveness of the man whom he had so fearfully wronged, he turned to the witness and interceded that she pray for him. If dying declarations are sanctified by the solemnity of approaching death, and the awfulness that envelopes the man with sanctity of the obligation to tell the truth, here we have a dying statement of the man who had wronged appellant, in conformity of the statement made by the wife. Under all these circumstances, as before detailed, and as shown as occurring around the death scene of this tragedy, there occurs to us but one conclusion and that is, that the original moving cause for this homicide was as detailed by Mrs. Stewart. No more solemn corroboration could well have been obtained than was given by her insulter when he had but a few moments to live. This case is not one of murder under the facts detailed.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Henderson, Judge, absent.