## FRANK MARTIN v. THE STATE.

### No. 1803. Decided June 7, 1899.

**1. Manslaughter—Insults to Wife—Provocation—Charge.**

On a trial for murder, where the issue of manslaughter was predicated upon insulting conduct of deceased towards the wife of defendant, and where the evidence showed previous insults of the same character, it was error for the court, in its charge, to limit the adequate cause to the provoking conduct of the deceased at the time of the homicide. Defendant had the right to have the insulting conduct at the time of the killing viewed in the light of the former provocation and insulting conduct.

**2. Same—Adequate Cause.**

In submitting the law of manslaughter, under the facts stated in paragraph 1,. supra, the jury should have been instructed that they could look to all the facts and circumstances in determining whether adequate cause and sudden passion engendered. thereby were the cause of the killing.

**3. Murder—Experiment Evidence as to Gunshots and Opinion of Experimenter.**

On a trial for murder, where one of the important issues was as to whether defendant fired from the inside of a house through the window, or from the outside at a corner of the house, it was competent to prove various experiments made by a witness to ascertain where defendant was when the shots were fired; and that from these experiments witness' opinion was that the shots could not have been fired from the window. In such case, the witness' opinion is admissible as being a shorthand rendering of the facts.

APPEAL from the District Court of Hays. Tried below before Hon. H. TEICHMULLER.

Appeal from a conviction of murder in the second degree; penalty,. seven years imprisonment in the penitentiary.

Appellant was charged by indictment with the murder of E. P. Hodges, on the 13th day of July, 1898, by shooting him with a gun.

The following general statement of the case, which is substantially correct, is taken from appellant's brief:

While defendant was a mere child his father deserted his mother and came to Texas with the second Mrs. Martin, to whom he was married without being divorced from the first wife. Later he stole defendant from his mother and brought him to Texas, where he grew to manhood think-- ing his mother dead. His father had several daughters by the second wife, one of whom married deceased, Hodges. The father died in 1894, at his home in Kyle, and the stepmother and daughters branded appellant as a bastard child and denied him any interest in his father's estate. He· and his wife went away, and later learned in Missouri that his mother was alive, and that he was the legitimate child of his father. To vindicate his name and also assert an interest in his father's estate, he returned to Texas in 1897. After an interview with deceased and also his brother, John Hodges, who had married another of the half-sisters, they agreed to adjust the property matter. This was not done, however, and defendant and wife went to Kyle. He was put off from time to time, and finally, about a year before the killing, was fixing to go to San Marcos to see an attorney with a view of instituting legal proceedings, when deceased,,

who was then marshal of Kyle, under guise of his office, assaulted defendant violently, beating him up, and then publicly marched defendant to the calaboose and locked him up. This was the only time Hodges ever locked up any white man. Hodges was the older man, would weigh about 170 pounds, and was a strong, robust man. Defendant was much smaller, and a delicate man. Shortly after this assault the property matter was settled, and Hodges and family and Mrs. Martin and family moved to Bastrop. In February or March, 1898, Hodges returned to Kyle. From then up to the time of the killing Hodges repeatedly cursed defendant and his wife, threatened defendant's life, and, in language as vile as could be conceived, attacked the character of his wife. He accused defendant of trying to burn his house, and in connection therewith threatened his life repeatedly. Defendant avoided deceased on all occasions, and declared his desire to avoid all trouble. Some of the threats and insulting language of deceased were communicated to him before the killing. Defendant bore the reputation of a quiet, peaceable, and law-abiding citizen, while deceased was known as an overbearing, quarrelsome, and dangerous man. For some while preceding the killing defendant and his wife never permitted a light to burn in their house of a night, for fear of being shot from outside.

Defendant owned two places in Kyle side by side, facing east. Deceased owned and lived in a place adjoining or abutting against them and facing west. It was tacitly agreed and understood that neither should go on the property of the other. Defendant lived in his south place and rented the other. Hodges tried to get England to move into the rented house, offering to pay his rent for six months, telling him Martin would not meet him on the street, and that the fight would have to come off at the house. England, learning that Martin had agreed to rent his house to Solomon, a relative of Hodges' brother, told Martin what Hodges had said, and he refused to permit Solomon to move in. About ten days before the shooting the State's witness McKean came to Martin to rent the house. In conversation, Martin told him Hodges was not allowed on his property, to which McKean assented, rented the place, and moved in. McKean procured a cow which he kept in the lot on rear of the place and adjoining Hodges. The latter began coming over into the McKean lot, as McKean claims, to help milk the cow. The evening prior to the killing defendant went down town after supper, and returning was informed by his wife that Hodges, during his absence, had been walking up and down the partition fence between the McKean place and defendant's residence and stooping and peeping into the latter. On the day of the shooting deceased was talking to the witness Hall, and seeing defendant passing on opposite side of street, said: "There goes the damned bastard who robbed Mrs. Martin and her children, and then tried to burn me out. He ought to be killed, as he has no business living, and, by God, if he don't mind, I will turn his toes up before the going down and rising of the sun." The killing of Hodges occurred about 6:30 o'clock on the evening of July 13, 1898. As to the circumstances of the killing

the witnesses differ. They agree that Hodges had come into the lot on the place rented by defendant to McKean, where the cow was being milked, and had his pistol with him. The State's witnesses claim the wife of defendant came out, and in very abusive terms ordered deceased away, and that as he turned to go defendant fired from his dining-room window the fatal shot. The testimony for defendant shows that his wife told him Hodges was again on his place; that defendant announced his purpose to go and order him away; that she prevailed on him not to go, and she went instead and requested deceased to leave the place, but without any abusive language; that deceased said to her, "It is none of your business, you damned old bitch; you go back in the house;" that defendant heard this language, grabbed his gun, ran around outside to the northeast corner of his house, and there fired the shot.

Speaking of the threats made by Hodges and insulting talk about his wife as communicated to the defendant by the witness Speed, a few days before the killing, defendant testified: "It was mighty hard to take, and I hardly knew what to do. I knew that I was a poor man, and had had so much trouble in my life that I dreaded the thing. I knew if I went onto Hodges one of us would be killed very likely. If I killed him it would be bad enough, and no better if I got killed. Undecided what to do, I let matters stand as they were. I was constantly in fear of being waylaid, and went out almost none at night." And after relating the language used by Hodges to his wife when she asked him away just before the killing, he says: "I just could not stand this any longer, and grabbing my gun, which was standing in the north room, and cocking both barrels, I ran around the northeast corner of the house with the gun in my hand." The shooting then occurred almost instantly. The State's witness McCall, who saw defendant immediately after the shooting, says he was very much excited.

A material question in the case was whether Martin stood in his yard at the northeast corner of his house, or at the dining-room window when he fired. The witness S. R. Kone had inspected the holes in the fence and two walls of the barn made by the shots; he had made a critical examination and measurement as to the range of the shot, and had experimented with a cord and by sighting with his eye to determine from what point the shot came. The defendant asked the witness whether a person could have stood at any point in the window and fired the shot which made the marks found, to which he would have answered no; but the State objected, on the ground that the answer could only be the opinion or conclusion of the witness, which objection was sustained.

On manslaughter, the court gave the following instructions as to insults offered by deceased to defendant's wife:

"If you believe from the evidence that Frank Martin did kill E. P. Hodges by shooting him with a gun, and that he was not justified, and if you further believe that Hodges, immediately before the killing, insulted the defendant's wife, and that the defendant, under the immediate influence of sudden passion, provoked by such insults to his wife, killed E. P.

Hodges, you will find the defendant guilty of manslaughter and assess his punishment accordingly, which is by confinement in the penitentiary for a term not less than two nor more than five years.

"If you believe from the evidence that Frank Martin did kill E. P. Hodges by shooting him with a gun, under the influence of sudden passion; that such passion, however, was not produced by any insult of Hodges to his wife at the time, but by former insults offered to him and his wife, and the enmity existing between Hodges and himself, you will find the defendant guilty of murder of the second degree, and assess his punishment at confinement in the penitentiary for a term not less than five years."

*Will G. Barber,* for appellant.—The court erred in its charge to the jury on manslaughter, in this: The charge unduly restricts defendant before the jury exclusively to what provocation occurred at the immediate time of the killing, to determine the question of whether in shooting he acted under the immediate influence of sudden passion arising from an adequate cause, instead of authorizing or permitting the jury to consider the previous provocation of assaults, abuses, insults, threats, etc., by deceased toward defendant and his wife, in connection with what occurred at the time of the killing, in order to determine whether defendant acted under the immediate influence of sudden passion produced by an adequate cause. Certain acts and conduct of deceased at the time of the shooting might not, standing alone, be sufficient in the opinion of the jury, but when construed in connection with former acts and conduct would be, and they should have been permitted to so consider them. Miles v. State, 18 Texas Crim. App., 156; Bracken v. State, 29 Texas Crim. App., 362; Johnson v. State, 22 Texas Crim. App., 206; Howard v. State, 23 Texas Crim. App., 265; Baltrip v. State, 30 Texas Crim. App., 545.

The court erred in its charge to the jury in applying the law to the facts of this case in sections 10 and 11 thereof, wherein manslaughter and murder in the second degree are applied to the facts, because said charge has the effect of limiting the provocation which could reduce the killing to manslaughter to the one issue of deceased using insulting language to defendant's wife, instead of leaving the jury at liberty to consider the other provocations shown, such as deceased coming on the place owned by defendant, in view of and in connection with his having been there in the evening before peeping into defendant's house, and in view of and in connection with the previous assaults, abuses, insults, and indignities heaped upon defendant and his wife by deceased, and of the agreement between them that neither should go upon the property of the other.

Any condition or circumstance which is capable of creating sudden passion, rendering the mind incapable of cool reflection, may be adequate cause, and where the evidence shows a number of conditions or circumstances tending either singly or collectively to show adequate cause, the jury should not be restricted by the charge to a consideration of a single condition or circumstance, but should be directed to consider them all in

determining the question of adequate cause. Orman v. State, 24 Texas Crim. App., 495; Hawthorne v. State, 28 Texas Crim. App., 212; Cochran v. State, 28 Texas Crim. App., 422; Bracken v. State, 29 Texas Crim. App., 362; Bonner v. State, 29 Texas Crim. App., 223; Alexander v. State, 25 Texas Crim. App., 260.

The trial court erred in not permitting the defendant to show by the witness S. R. Kone that a man could not have stood in the dining-room window of defendant's house and fired the shot which made the marks upon the fence and barn at the place where deceased was shot.

The expression of the result of an observation of facts made by the witness is always admissible, whether called a fact or an opinion. Richardson v. State, 7 Texas Crim. App., 486; Powers v. State, 23 Texas Crim. App., 42; Clark v. State, 28 Texas Crim. App., 189; Crumes v. State, 28 Texas Crim. App., 516; Thompson v. State, 35 Texas Crim. Rep., 352; Hartgraves v. State, 39 S. W. Rep., 661; Railway v. Locker, 78 Texas, 279; Railway v. Jarrard, 65 Texas, 560; Bennett v. Meehan, 86 Ind., 566; State v. Southern, 48 La. Ann., 19 South. Rep., 668.

*Robt. A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at seven years confinement in the penitentiary.

Complaint is made of that portion of the court's charge submitting the law of manslaughter which instructs the jury "that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation." The law of manslaughter was applicable largely on account of the insulting conduct and language used by deceased in reference to the wife of appellant. There had been ill feeling between appellant and deceased for a considerable space of time prior to the homicide. The language used by deceased was of a very opprobrious character, denouncing appellant's wife as a vile woman,—in other words, a prostitute. These expressions were made known to appellant. On the evening of the homicide deceased was on the premises of one McKean, adjoining the residence of appellant. Appellant was the owner of the premises occupied by McKean, McKean being his renter. It seems that the presence of deceased, Hodges, had been interdicted on said premises by appellant. Just prior to the homicide, appellant's wife informed him of the fact that Hodges was on the premises again, and had been walking up and down the partition fence, seeking to look into their residence. Mrs. Martin (appellant's wife) went out in the back yard, and requested deceased to leave the premises. He used insulting language towards her at the time, which was heard by appellant. He immediately secured his gun, went to the northeast corner of his residence, and as he got in view of deceased, raised his gun and shot deceased. There are a great many facts and circumstances introduced in evidence which show the state of feeling between the parties. We only state in a general

way the evidence bearing upon the question of manslaughter, and the exception to the charge because it limits the adequate cause to a provocation arising at the time of the homicide. Under this state of case the jury were charged as above stated, limiting the provocation to the time of the commission of the offense. The court further charged in this connection that if the jury believed "that deceased immediately before the killing insulted appellant's wife, and, under the immediate influence of sudden passion provoked by such insults, appellant kill deceased, to find him guilty of manslaughter;" and, further, that in judging of what transpired at the time of the homicide, and the intention with which defendant committed the homicide, to view the facts from his standpoint, in view of the relations existing between the parties and the threats made by deceased, if he made such threats. The court limited manslaughter to the provocation arising at the time of the killing. As was said in Tucker v. State (decided at present term), 50 Southwestern Reporter, 711: "Where insulting conduct or language is relied upon to reduce the homicide to manslaughter, the party is entitled, where the facts in evidence suggest the issue, to a charge in reference to the first meeting after the insulting conduct or language had been communicated; and in such case giving in charge the requirements of article 699, Penal Code, in reference to the provocation arising at the time, is erroneous,"—citing Williams v. State, 24 Texas Criminal Appeals, 637; Eanes v. State, 10 Texas Criminal Appeals, 421. Defendant had the right to have the law in regard to insulting conduct as a provocation given in charge to the jury, not limited, under the facts of this case, to the insulting language used at the time of the homicide. The jury could look to the previous insults as well. This question has been frequently decided. Therefore we deem it unnecessary to discuss it. The error complained of is intensified by the further charges of the court, wherein the jury were told that "if Frank Martin killed deceased by shooting him with a gun, under the influence of sudden passion, and that such passion was not, however, produced by the insult of Hodges to his wife at the time, but by reason of former insults offered him and his wife, and the enmity existing between them, he would be guilty of murder in the second degree;" and, further, that "if deceased killed Hodges by shooting him with a gun, with a deliberate mind, and in pursuance of a formed design, with intent to revenge former insults and wrongs of deceased, * * * he would be guilty of murder in the first degree." While the jury only convicted of murder in the second degree, this latter charge especially had the tendency to minimize, and perhaps turn against him in the minds of the jury the defensive matters based upon the insulting conduct and language of deceased prior to the evening of the homicide. If viewed in the light of the provocation given at the time of the killing, the former insulting language and conduct of deceased towards appellant's wife would serve to intensify the passion arising at the time of the killing, and the defendant had the right to have the jury view the homicide from that standpoint. The court seems to have taken the view that the former provocations and insulting conduct could

only be viewed by the jury in the light of circumstances tending to show malice and evil intent on the part of defendant, and to prevent such testimony from being used by the jury for the purpose of showing sudden passion. As we understand the law, defendant had the right to have the insulting conduct given at the time of the killing viewed in the light of the former provocation and insulting conduct. Such are the authorities in this State.

We are also of opinion that, in submitting the law of manslaughter under the facts of this case, the jury should have been further instructed that they could look to all the facts and circumstances in determining whether adequate cause, and sudden passion engendered thereby, were the cause of the killing.

It was a contested question on the trial whether appellant shot deceased from the window of his house, or from a point in his yard near the northeast corner of the residence,—the State's theory being that he fired from the window; and appellant's, that he fired from the corner of the house while standing in the yard. The issue was one of vital importance, and the testimony positive both ways. Among other witnesses introduced was S. R. Kone, by whom appellant proved various experiments made by placing parties at the corner of the house, and where the shot took effect in the fence and in the barn, and where deceased stood, in order to ascertain whether appellant actually stood at this point, or fired from the window. Without going into details, many observations and a few experiments were made by this witness and others. The contention of defendant was, if the shot was fired from the window, they could not have made the holes in the fence and barn, as shown to have been made by the shot from appellant's gun, and which missed deceased. After detailing these experiments, defendant proposed to prove by him that after making these experiments the shot holes in the fence could not have been made by anyone firing from the window as testified by the State's witnesses. We believe, under the circumstances of this case, this testimony should have been admitted. It is sometimes practically impossible for the witness to detail facts and circumstances so as to convey a correct idea of the facts sought to be proved by him,—as, for instance, comparing the tracks upon the ground with the shoes found upon the accused. This is denominated by the writers as being a shorthand rendering of the facts, and under such circumstances this character of testimony is generally admissible. Powers. v. State, 23 Texas Crim. App., 42; Clark v. State, 28 Texas Crim. App., 189; Crumes v. State, 28 Texas Crim. App., 516. For the reasons indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*