### FRANCISCO ESPINOZA V. THE STATE.

#### No. 3000.    Decided March 11, 1914.

#### Rehearing denied April 1, 1914.

#### 1.—Murder—Evidence—Co-defendant—Suspended Sentence.

Under the second Suspended Sentence Act, neither the verdict of conviction nor the judgment thereon shall become final except under certain conditions, and where a co-defendant pleaded guilty to assault with intent to murder and his punishment was assessed at two years confinement in the penitentiary, but his sentence was suspended on the recommendation of the jury, he was a competent witness for the State against the defendant who was upon trial for murder.

#### 2.—Same—Evidence—Non-expert Opinion.

Where, upon trial of murder, it developed that the wounds upon deceased, other than that in the back under the shoulder, were shallow wounds while the one in the back was a fatal wound, and the opinion of non-expert witnesses that this was so based upon facts which they detailed before the jury, their expression of opinion was but the crystallization of the facts, there was no error in admitting in evidence their opinion.

#### 3.—Same—Rule Stated—Non-expert Opinion.

The admissibility of the opinions of non-experts rests upon three necessary conditions: First, that the witness detail to the jury so far as he is able the facts and circumstances upon which his opinion is based; second, that the subject matter to which the testimony relates can not be reproduced and described to the jury precisely as it appeared to the witness at the time; and, third, that the facts upon which the witness is called upon to express his opinion are such as men in general are capable of comprehending. Following Jackson v. State, 29 Texas Crim. App., 458, and other cases.

#### 4.—Same—Charge of Court—Accomplice.

Where, upon trial of murder, the accomplice testified that he inflicted the wounds in front with one knife, and placed defendant at the side or back of deceased, there was no error in admitting evidence of the non-expert opinion of witnesses based upon facts which they detailed before the jury that the wound in the back was the fatal one and was inflicted with a different instrument than that with which the wounds in front were inflicted, the court instructing the jury that said co-defendant was an accomplice and required the necessary corroboration. Davidson, Judge, dissenting.

**5.—Same—Misconduct of Jury—Allusion to Defendant's Failure to Testify.**

Where it was shown that one juryman asked why the defendant did not testify when he was promptly informed that he could not consider that, and there were no further remarks about the matter and no discussion whatever relative to it, there was no error.

**6.—Same—Principals—Charge of Court.**

Where, upon trial of murder, the evidence raised the issue of principals and the court properly charged thereon, there was no error in refusing requested charges on the same subject and others which were on the weight of the evidence. Davidson, Judge, dissenting.

**7.—Same—Motion for Rehearing—Stating Facts in Opinion.**

Where the motion for rehearing insisted that the conclusions of fact were incorrectly held by this court, but the record on appeal bore out the court's statement of facts and conclusions, there was no error.

**8.—Same—Evidence—Non-expert Opinion.**

Where the non-expert witnesses did not give any opinion as to which wound was first inflicted, but simply testified that the wound inflicted in the back of the deceased could not have been made by the instrument that inflicted the wounds in front of deceased, and that the wound in the back was a fatal one, basing their opinion upon facts detailed to the jury, there was no error. Distinguishing Powdrill v. State, 62 Texas Crim. Rep., 442.

**9.—Same—Sufficiency of the Evidence—Circumstantial Evidence—Charge of Court.**

Where, upon trial of murder, the evidence and circumstances in the case sustained a conviction of murder in the second degree under a proper charge of the court upon circumstantial evidence and the law applicable to the facts in the case, there was no reversible error.

**10.—Same—Charge of Court—Principals—Fatal Wound.**

Where, upon trial of murder, the court correctly charged the jury that the mere presence of the defendant would not constitute him a principal and that before they could convict him they must find that he, knowing the unlawful intent, did aid by acts or encourage those actually engaged in the commission of the offense, and the evidence authorized a conviction that defendant acted with another in the commission of the offense, it would be immaterial which wound was the fatal one.

**11.—Same—Charge of Court—Objections.**

Where, upon trial of murder, the defendant was tried under the law which provides that the court shall prepare a charge and submit it to counsel, who shall then make such objections to the charge in writing as they desire, this court on appeal can not pass on any question not thus made and presented to the trial court.

**12.—Same—Accomplice—Charge of Court.**

Where, upon trial of murder, the court charged on accomplice testimony and submitted same to defendant's counsel, who made no objections thereto as required by law, this court can not review the matter; besides, the evidence raised the issue of accomplice and the court, therefore, properly submitted the question in his charge. Davidson, Judge, dissenting.

Appeal from the District Court of Medina. Tried below before the Hon. R. H. Burney.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Leonard Brown* and *Elmer De Montel,* for appellant.—On question of admitting non-expert testimony: Powdrill v. State, 62 Texas Crim. Rep., 442, 138 S. W. Rep., 114.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was convicted of murder, and his punishment assessed at five years confinement in the State penitentiary.

The first objection is to the action of the court in permitting Andres Romero to testify. Andres Romero was indicted, charged also with the commission of the offense. The State's theory was that the fatal wound was inflicted by appellant by stabbing deceased in the back. There was evidence that Romero stabbed deceased also in the front. Romero plead guilty of assault to murder, and his punishment was assessed at two years confinement in the State penitentiary, but upon the finding and recommendation of the jury his sentence was suspended, and none has been pronounced against him. Appellant contends that this conviction rendered him incompetent as a witness. Under the first suspended sentence law passed, if it had been sustained, appellant's contention would be sound. (Snodgrass v. State, 67 Texas Crim. Rep., 615, 150 S. W. Rep., 162.) But this law was held unconstitutional on account of the other provisions, and in re-enacting the law, or passing the second suspended sentence Act, the Act so changed the wording of the law as not to render the judgment a final judgment. (Acts Thirty-third Legislature, page 8.) In section 2 it is provided that in cases where the jury recommends a suspension of the sentence, neither the verdict of conviction nor the judgment entered thereon shall become final, except under the conditions and in the manner and at the time provided by section 4. In section 4 it is provided that if thereafter sentence shall be pronounced under the conditions named in the law the judgment shall then become final, evidencing clearly the intent and purpose not to make the judgment final until sentence is pronounced.

In the next two bills objection is made to a portion of the testimony of Peter Hoag. He testified: "I am justice of the peace of Precinct No. 3 of this county. I was called upon to view the body of a dead man in May of this year; that was at Chris Schuchart's ranch. I found a dead man there in the road, whose name I think was Munoz, Petronilo Munoz. He was lying in the center of the road, I couldn't tell how far from the saloon; it was a moonlight night, but the saloon was closed when we got there, it might have been twenty or thirty yards from the saloon. I found stabs on the dead man, he was stabbed in here (indicating), he had some cuts on his arm, he had a stab on his shoulder, right shoulder, cut right below his shoulder blade; cuts were in his right arm, then he had one cut up here on his head. The stab in the back was under the right shoulder blade, that seemed to me to be a straight stab. As to

what caused the death of the man, I guess it was the stab from behind, here (indicating), the stab wound in the shoulder, that is what caused death in my opinion. (Knife is shown witness.) I found that knife there on the ground near the body. I examined the wound here (indicating) and the one behind here (indicating), and I took that knife and probed it, to see if they were made with the same knife, and it showed it was a different knife, because the cut was very small. I took this knife and probed it and the point of this knife didn't go in very far, down about this deep (indicating)." It is objected that the statement that the wound in the back could not have been made with the knife found on the ground is but the expression of an opinion. When it is shown that he took the knife and it was so broad that it could not be made to enter the wound in the back, this is not an expression of an opinion, but is the statement of a fact; as is also the statement that the wound in the back could not have been made with this knife, for he also tried it in this wound. It is also claimed that the statement "as to what caused the man's death, I guess it was the stab from behind,—that is what caused death," is but an expression of an opinion of the witness, and should not have been admitted.

L. W. Burrell testified he was constable and went there with the justice of the peace, and saw the deceased lying there. He says: "We examined the body; took down his clothes and looked, it had a cut in there, in the right side, then he had some little stabs, cuts, slashes in the arm and some on his head; we turned him over and I found another stab in the back, and I believe that is the wound that killed him. As to my opinion as to the cause of the man's death, it was the stab in the back. I did not find any more wounds in the back. As to the size of the stab wound in the back, it was a tolerably small stab, it was a small wound but it was very deep, though. I stuck my finger in it at least that deep and pulled on it and it would suck wind, and I know by that that it must have went into the hollow; I made that experiment. I saw the judge take the knife there (in evidence) that evening in my presence and try to put it in the wound and it didn't fit. I tried it myself the next morning and it wouldn't go in." The same objection that was made to the testimony of the justice of the peace, as to which wound caused death, is also made to this witness' testimony. By reading the testimony it is seen that the wounds other than that in the back under the shoulder were shallow wounds, while the one in the back was probed and found to have penetrated the hollow, and the expression that in their opinion this wound is the one that caused the death of Munoz, is based upon facts which they detailed before the jury,—in other words, the expression of the opinion is but the crystallization of the facts—the result of the wounds found on the body—which was the fatal wound ascertained by probing and examination of the wounds, only one having been found to have entered a vital part. In the Encyclopedia of Evidence the rule is said to be, if the testimony should be held to be but the expression of the opinion of Justice Hoag and Constable Burrell: "The admissi-

bility of the opinions and conclusions of non-experts rests, as has been judicially declared, upon three necessary conditions which will be considered seriatim hereinafter, as follows: (1) That the witness detail to the jury, so far as he is able, the facts and circumstances upon which his opinion is based, in order that the jury may have some basis by which to judge of the value of the opinion; (2) that the subject-matter to which the testimony relates can not be reproduced and described to the jury precisely as it appeared to the witness at the time; and (3) that the facts upon which the witness is called upon to express his opinion are such as men in general are capable of comprehending and understanding." (Vol. 5, p. 657.) This rule has been adopted and followed by this court. Jackson v. State, 29 Texas Crim. App., 458; Powers v. State, 23 Texas Crim. App., 42; Clark v. State, 28 Texas Crim. App., 189; Thompson v. State, 19 Texas Crim. App., 593; Powdrill v. State, 62 Texas Crim. Rep., 420; Bennett v. State, 39 Texas Crim. Rep., 639; Martin v. State, 40 Texas Crim. Rep., 660. When a man is killed it is always a matter of opinion or deduction as to what was the cause of his death, and it has always been held in this State, where a person views the body and examines the wound or wounds, he may give his opinion as to the kind of instrument used in making the wounds, and the cause of death. In this case we think it an immaterial question as to whether the wound in front or the wound in the back caused the death of deceased, for the evidence would clearly show that the wounds in front and those in the rear were made by persons acting together, and it would be immaterial whether the one in the front or the other one in the rear caused deceased's death. The court instructed the jury Andres Romero was an accomplice in law, and they could not convict upon his testimony alone, and it is made clear by the testimony that Romero inflicted the wounds in front with one knife, while a wound in the back was inflicted with another, and appellant is placed at deceased's side or back by the testimony.

It is shown that one juryman asked why the defendant did not testify, when he was promptly informed that he could not consider that, and there were no further remarks about the matter, and no discussion whatever relative to it. This presents no error.

The court's charge on principals is in language frequently approved by this court, where the defendant was present, and the facts and circumstances show that he participated in the unlawful acts. And the court having given appellant's special charge No. 2, there was no necessity to give the other special charge requested. In addition thereto, it would have been on the weight to have been given the testimony.

The evidence supports the verdict and the judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE (dissenting).—Appellant was convicted of murder in the second degree, his punishment being assessed at five years confinement in the penitentiary.

The evidence for the State is practically that testified by Romero About the 17th or 18th of May, 1913, a number of Mexicans were gathered at the Schuchart saloon. They were drinking and had been friendly to the time of the difficulty, or a few moments preceding it. Romero says Mr. Schuchart ordered them out of the saloon and they left; himself, appellant, Vasquez, Ruiz and deceased were there. Appellant, he says, was standing in the center of the road after leaving the saloon; that they were all drinking in the saloon, only Ruiz did not drink. Munoz, the deceased, was drinking, and they were all drinking together. Vasquez wanted to fight with appellant in the house, and the fight was prevented. Deceased said to appellant: "You want to fight with Francisco Vasquez, you can have it with me." Romero then testifies: Francisco Espinoza and deceased then went out to the road, and I went in behind them to where they stopped, in the center of the road. They were talking about the fight. When deceased said those words, I told him 'What did they want to fight for,' and deceased told me that if I wanted anything I could get it with him too, and I told him, 'No, what we want to fight for, we were all around together and there was no reason to fight,' and deceased said some words to me in English; I can't pronounce them, but I can understand them. When he told me them words, I answered him in Spanish. Then I put my hand on what I had, a knife. This is the knife (shown witness) that I had. I struck some blows at him, but don't know if I hit him or not, I know I hit him once; I am not certain about the place I cut him on the side—I am not sure if I cut him on the right or left side, I don't know. I don't remember how many times I cut him. Espinoza was standing close to deceased at this time. I was standing in front of him; Espinoza was standing on one side of him, on the left side, about one step from him, about from there to the corner of the desk (in court room), I don't know how many feet, I can't calculate. That was in the center of the road, nobody but us three was there, the rest of the party was in the door over at the saloon. No one of the party came down to where we were. All three of our hats fell, and when the dead man fell, I got a hat and left. The deceased fell on one side, to the side where I was. Espinoza got away from there when the deceased fell." On cross-examination he says, "Espinoza, deceased and myself were very drunk. We had not had one difficulty before that trouble. The trouble arose when I went out to where they were standing in the center of the road. I told Munoz once or twice what did he want to fight for, he ought not to do that. I didn't see Munoz with a knife, but I know that he had a knife at that time. When I spoke my words to him in Spanish, then I cut him (Munoz). I was on the left side of Munoz. I did not see nothing of Espinoza's hand; Espinoza was standing right there; he was standing there doing nothing. I did not stab Munoz, I cut him; when I cut him he fell to the ground; he fell to one side, he came on top of me, then fell to the ground. I couldn't say what distance Espinoza was from Munoz at that time, I don't know if he was several feet or not. If Espinoza made any motion towards Munoz, I didn't see him, I don't

remember. I don't know if Munoz turned around or not; I was just cutting at him. All I know about it, Munoz fell on the ground, I grabbed the hat and ran away. Espinoza was very drunk, too. I didn't see nothing in Espinoza's hand." Romero was the only witness who testified to the facts of the difficulty. There was a butcher knife found at the body of the deceased which seems to have belonged to the witness Romero. Deceased was cut several times; one cut was a stab in the shoulder, and a small wound in the back under the point of the shoulder. No witness placed the defendant at the place of the homicide except Romero. The State introduced the statement of appellant that he was not present and knew nothing of the killing, and also appellant's voluntary statement taken in the examining trial, which is as follows: "My name is Francisco Espinoza and I live on the Schuchart ranch. I did not see any of the fight. As I went to open the gate to go home, Pas Ruiz caught up with me and said that the men were fighting. I then continued by journey and did not know anything about the killing until after I returned from my house to the store to buy some goods. Then the sheriff in the automobile got me and Manuel Schuchart. I did not know the man was killed until I went down to where he was in the road, surrounded by the crowd. My house is about one-half mile from the place of the killing. No, the knife or hat shown me are not mine."

The court charged the jury affirmatively that Romero was an accomplice. This is error. This assumes appellant and Romero acted together in the killing, and also assumes defendant's presence at the place. Romero was not corroborated as to this fact, and the State denied, by using appellant's statement, that he was present. The condition of the case is a little peculiar under the facts. Romero testified that appellant had nothing to do with the fight. He went out there to fight, and he, Romero, went along and interfered, and the deceased turned upon him, and he and deceased fought, and he stabbed deceased with his knife, and that appellant did nothing. He excludes the idea that appellant engaged in the fight, or even had anything in his hand; in fact testified he did nothing. The State used the voluntary statement of appellant to the *effect that he did nothing, and was not even present.* The State, therefore, must rely upon the testimony of Romero to prove, first, that appellant *was aiding and encouraging Romero, which Romero denied,* or, second, that he engaged in the difficulty in some way. Unless he did appellant was not a principal in the transaction, nor was Romero an accomplice to the appellant. There must be criminal connection between the parties to create either relation. Any party who is used as a witness who had any guilty connection with the transaction under investigation is an accomplice and his testimony needs corroboration. If he did not engage in the difficulty and had nothing to do with it, he would not be a principal or accomplice. The court should have drawn the line of distinction clearly in his charge, that if appellant was present and did not in any way engage in the difficulty, then the fact that he went out to fight the other man and did not fight him, but deceased

turned upon Romero and had a difficulty with him in which appellant did not engage, appellant would not be guilty. That he was a mere onlooker would not make him guilty. He must have some connection with it either by participating directly or aid and encourage the man who did the killing. Then, again, the court should not charge directly that Romero was an accomplice. Under the facts he may not have been an accomplice. If they were in any way acting together, of course his testimony would be that of an accomplice; if not, then he would not be. The assumption by the court that he was an accomplice and in so charging directly is an assumption, at least to some extent, if not completely, that the parties were acting together, and both participated in the killing. There are some circumstances showing two knives may have been used in the difficulty, and upon this the State relied to show that two men were engaged in the killing. This, however, is denied by appellant and by Romero. Under their evidence appellant did not engage in the difficulty, and was not even present. He could not be a principal if absent, and the State proved him absent.

The judgment ought to be reversed and the cause remanded.

ON REHEARING.

April 1, 1914.

HARPER, JUDGE.—As in the motion for rehearing, it is insisted that the conclusions of fact are incorrectly held in the original opinion, we will state some portions of the evidence more fully. Andres Romero testified:

"My name is Andres Romero. I do farm work. In May of this year I was seven miles on this side of Rio Medina, working for Ascencion Labor. I am acquainted with Francisco Espinoza, the defendant in this case. I had known him a short time in May of this year. I knew Petronilo Munoz; he is dead; his death occurred the 17th or 18th of May, this year, over at Manuel Schuchart's saloon. It occurred in the center of the road about the distance from the saloon of that chair to that wall (indicating in court-room); I don't know how many steps it would be, can't approximate it, never measured it. Before we never did have no reasons, until that day, them words that he said to me, that was the reason of the trouble. I can't know what caused Petronilo's death, have no idea. I saw him immediately before he died. Manuel Schuchart was going to close the saloon and run us all out, told us to get out. Me, Francisco Espinoza, Francisco Vasquez, Pas Ruiz and Petronilo Munoz were there, I don't recollect any other persons, that is all I know. Petronilo was standing in the road, in the center of the road. We were all drinking there in the saloon—only Pas Ruiz didn't drink there in the saloon. Petronilo Munoz was drinking, all drinking together. Francisco Vasquez wanted to fight with Francisco Espinoza and we didn't let them fight. The deceased said these words, 'You want to fight with

Francisco Vasquez, you can have it with me,' and then Francisco Espinoza and deceased went out to the road, and I went in behind them to where they stopped in the center of the road. They were talking about the fight. When deceased said those words, I told him 'What did they want to fight for'; and deceased told me if I wanted anything I could get it with him too, and I told him, 'No, what we want to fight for, we were all around together and there was no reason to fight,' and deceased said some words to me in English—I can't pronounce them, but I can understand them. When he told me them words, I answered him in Spanish. Then I put my hand on what I had, a knife. This is the knife (shown witness) that I had. I struck some blows at him, but don't know if I hit him or not, I know I hit him once—I am not certain about the place I cut him on the side—I am not sure if I cut him on the right side or left side, I don't know. I don't remember how many times I cut him. Espinoza was standing close to deceased at this time. I was standing in front of him; Espinoza was standing on one side of him, on the left side, about one step from him, about from there to the corner of the desk (in court room), I don't know how many feet, I can't calculate. That was in the center of the road, nobody but us three was there, the rest of the party was in the door over at the saloon. No one of the party came down to where we were. All three of our hats fell, and when the dead man fell I got a hat and left. The deceased fell on one side, to the side where I was. Espinoza got away from there when the deceased fell. I don't know where he stopped at (Espinoza); Espinoza moved away from there when the deceased fell. When the deceased fell I moved away and stopped, from here to where you are (counsel) and took the hat and left. I don't know who that hat belonged to, it ain't my hat; it was a black hat. I have never seen that hat since, it has got a name in it. (Witness being shown hat.) That is the hat that I picked up.

"I don't know what the deceased did after he fell, I moved away from there. When they were standing I was looking at him; when I was leaving I didn't look back. I can't know whether the deceased remained where he fell or not, when I left there he was there. I next saw Espinoza after the fight when they arrested me, which was next morning about 3 o'clock; I seen Espinoza in the calaboose, there where they took me."

Cross-examination: "As to what time had they went to the saloon that evening, I went about 5 o'clock. We stayed there until they were going to close up the saloon, about 10 o'clock. As to how many drinks I had, first I spent 50 cents and then I borrowed a dollar to spend too. Espinoza, Petronilo and myself were very drunk. We had not had one difficulty before that trouble. The trouble arose when I went out to where they were standing in the center of the road and I heard some words, but I don't know what the words were—I can't pronounce the words. I told Munoz once or twice, what did he want to fight for, he ought not to do that. I didn't see Munoz with a knife, but I know the knife—know that he had a knife at that time. When

I spoke my words to him in Spanish, then I cut him (Munoz). I was on the left side of Munoz. I did not see nothing in Espinoza's hand; Espinoza was standing right there; he was standing there, doing nothing. I did not stab Munoz, I cut him; when I cut him he fell to the ground; he fell to one side, he came on top of me, then fell to the ground. I couldn't say what distance Espinoza was from Munoz at that time, I don't know if he was several feet or not. If Espinoza made any motion towards Munoz I didn't see him, I don't remember. I don't know if Munoz turned around or not; I was just cutting at him. All I know about it, Munoz fell on the ground, I grabbed the hat and ran away. Espinoza was very drunk, too. I didn't see nothing in Espinoza's hand. I know Munoz had a knife because he always carried it; I don't know if he carried it open or not. I had this knife (shown witness) in my pocket."

Redirect examination. "I did not see any other knife except this knife (shown witness); that is the way that I used it (illustrating), cutting. I am not sure whether Munoz faced me all of this time or not, because we all three talked together. I didn't see any knife besides that, I don't remember. I did not cut or stab Munoz in the back. Munoz was about my size. I can not say how Espinoza was dressed that afternoon."

Recross examination. "I was cutting at Munoz, I don't know where I cut him. I don't know whether Munoz turned around or not; I didn't stab at him. At the time of the trouble I was mad; I don't know if Espinoza was mad or not." This is all of his testimony just as reported in the record.

Manuel Schuchart testified: "I know the defendant, Espinoza. I knew Petronilo Munoz. I saw them at my place on the 17th of May last. Andres Romero was there. They were drinking beer, having a good time. Francisco Espinoza was there when the saloon was closed. Petronilo Munoz was also there, and Andres Romero. They killed Petronilo Munoz. . . . As to seeing Espinoza that night after I had seen the dead body, I was just leaving there, I seen him going away, just past the little gate, past the saloon, going off. I guess that was about 30 or 40 yards from where the body lay, something like that. He was kind of toward the saloon, he came by the saloon and went towards home, a gate there. I didn't notice how he was dressed, it was after night, I couldn't tell. I saw him after he came back after a while again, after quite a bit. He then had a coat on and no hat. He had a black coat. I noticed the hat he had on before the killing, it was a black hat. When Espinoza came back after the killing, he was looking for his hat. He described the hat, he said it had 'F. E.' or 'F. A.' or something in it. He said that he had his initials in it. He did not describe it by color. I had no conversation with Espinoza about the killing—he told me that he wanted me to shut up, he didn't say what, though. He told me that in English, he told me that he wanted me to keep my mouth shut."

Lee Schuchart testified: "The first I knew about the killing, my

brother notified me over the phone. It must have been about half past eight o'clock then. The last I had seen of the defendant, we had just closed the saloon, it was between 7 and 8 o'clock. He had on a blue jumper and black hat, otherwise I don't know how he was dressed, I don't remember. I do not remember what kind of buttons were on that blue jumper. I saw Espinoza, the defendant, when he came back there after the body was found, that was inside of half an hour or so after I was informed in regard to the killing. I noticed how he was then dressed; he had on a black coat, but didn't have any hat, he was looking for his hat. As to his giving any description of the hat, he didn't give any color, but he said it had 'F. A.' in it. He said that in English. 'A' in Spanish is 'E' in English."

The testimony of the justice of the peace and constable is copied in the original opinion and unnecessary to re-state, only adding that the constable testified: "I have seen this hat before. I saw it when I arrested Andres Romero. He had the hat on."

The State offered this hat in evidence, which was identified by these and other witnesses, and which had the initials "F. E." in it, which was found by the body of the deceased. It is seen by the other evidence that appellant came back to the dead body bareheaded, inquiring for his hat, and said that it had his initials F. E. in it. Appellant and Romero were arrested that night and carried to the jail, and on the road traveled there was found another knife, full of blood, the next morning.

It is true that appellant denied being present at the scene of the homicide, and denied that this was his hat. The State introduced this statement, and then introduced evidence of Romero, Manuel Schuchart and other testimony and showed that the statement was untrue. It introduced evidence showing that a black hat with the initials F. E. in it was found by the side of the dead man, and that appellant Espinoza was there bare-headed looking for his hat after it had been picked up, and then said it was his hat. There are other facts and circumstances in evidence we deem unnecessary to detail, further than to say that Constable Burrell testified that on the night of the homicide Pas Ruiz (in the presence of appellant) told him that appellant and Romero killed the deceased, and he then arrested Espinoza. It is true that appellant denied that he had seen the dead man at all that day, yet the evidence overwhelmingly shows that he was with him in the saloon; drank with him, and went out to the saloon with the dead man.

Appellant again insists that we erred in admitting the testimony of the justice of the peace and constable, copied in the original opinion, and cites us to the case of Powdrill v. State, 62 Texas Crim. Rep., 442, 138 S. W. Rep., 114, in which it was held not permissible to permit a doctor to state which, in his opinion, was the first wound inflicted. That opinion correctly decided the question under the facts of that case, but no one in this case gave any opinion as to which wound was first inflicted. What they did testify was that the knife found on the ground could not have inflicted the wound in the back, because they tried to in-

sert it in the wound and the blade was too broad; much broader than the stab wound in the back; that this wound went deep enough, as ascertained by investigation made there on the ground, to reach the hollow, and was the wound which caused the deceased's death. They also examined the other wounds and described them as shown by their testimony. The other cases cited by appellant are cases similar in character to the Powdrill case, and have no application to the evidence adduced in this case, which has always been held admissible as shown by the authorities cited in the original opinion.

The next contention in the motion for rehearing is that we erred in holding the evidence sufficient to sustain the conviction. The evidence for the State shows that appellant and one Vasquez had a quarrel but they were not permitted to fight, when deceased said to appellant, "You want to fight with Francisco Vasquez—you can have it with me," and then appellant and deceased went to the road, and were talking about fighting, and Romero asked, "What do you want to fight for?" and deceased remarked to Romero, if he wanted anything he could get it, turning around facing him, when the fight started, Romero being in front of deceased, while appellant was at his side or back. In a few seconds deceased dropped dead, with wounds in front and a wound behind, it being clearly demonstrated that the wound in the back was inflicted with a different knife from those in front. Appellant fled, but returned in search of his hat, which had been picked up by the side of the dead man. The court instructed the jury: "In this case the State relies for a conviction upon circumstantial evidence, and you are instructed that in order to warrant a conviction upon circumstantial evidence each and every fact necessary to establish the guilt of the accused must be proved by legal and competent evidence beyond a reasonable doubt, and the facts and circumstances proved should not only be consistent with the guilt of the accused, but inconsistent with any other reasonable hypothesis than that of his guilt, and in such cases it is not sufficient that the circumstances may coincide with, account for and therefore render probable the guilt of the accused, they must exclude, to a moral certainty, every other reasonable hypothesis than that of the guilt of the accused as charged, and produce in your minds a reasonable and moral certainty that the accused and no other person committed the offense, or was a principal in the commission of the same, as that term has been hereinbefore defined." At the time of the trial when the charge was submitted to him the only exceptions taken to the charge of the court below read as follows:

"Now comes the defendant in the above entitled and numbered cause and excepts to paragraph 9 of the court's charge wherein it charges on the law of principal in that said charge is not supported by the evidence, the undisputed evidence showing that the defendant, Francisco Espinoza, did not aid Andres Romero in his assault on the deceased by 'words.'

"2. That said charge is insufficient in that it failed to state that before a defendant could be convicted as a principal, where a killing is committed in his presence, that such killing must be done in pursuance

of a previously formed design in which the minds of the party witnessing the killing must unite with and concur with the mind of the party actually doing the killing."

The court instructed the jury: "All persons are principals who being present are guilty of acting together in the commission of an offense, and when an offense is actually committed by one or more persons, but others are present and knowing the unlawful intent, aid by acts, or encourage those actually engaged in the commission of the unlawful act, such persons so aiding or encouraging in the commission of the offense, or taking part therein, are principal offenders and may be prosecuted and convicted as such. In this connection, however, you are further instructed that the mere presence of a party at the time and place where another is engaged in committing an offense will not constitute such party a principal, he must, knowing the unlawful intent of the other party, actually do some act in the furtherance thereof, or in some way encourage the party actually committing the offense, in order to be prosecuted and convicted as a principal to such crime." It will be noticed that the court does not use the word "words" in the charge, but instructs the jury that his mere presence would not constitute him a principal, but before they would be authorized to find him a principal in the commission of the offense, they must find that he, knowing the unlawful intent, did aid by acts, or encourage those actually engaged in the commission of the offense, and the record in this case clearly authorized a finding by the jury that appellant inflicted the wound in the back, while Romero was inflicting the other wounds, and it would be immaterial under such circumstances which wound was the fatal wound. The charge as given has been frequently approved by this court. (Barton v. State, 53 Texas Crim. Rep., 443; McKinney v. State, 49 Texas Crim. Rep., 591; Parks v. State, 79 S. W. Rep., 537.)

The court also instructed the jury: "If you find from the evidence that the said Petronilo Munoz was killed, and you further find from the evidence that one Andres Romero inflicted the wound that caused his death, then in case you so find the fact to be, or if you have a reasonable doubt of this, you will acquit the defendant, unless you further find that the defendant was present and aided and abetted in the killing of the said Petronilo Munoz, or encouraged the said Andres Romero in doing so as a principal, as that term has hereinbefore been explained to you." Thus it is seen that the court in his charge protected every right of defendant, and the charge is subject to neither of the exceptions made in the court below at the time the charge was submitted to appellant's counsel. This case was tried November 7, 1913. The Legislature passed a law which went into effect July 1, 1913, four months prior to the trial, which provides that the court shall prepare a charge and submit it to counsel, who shall then make such objections to the charge in writing as he desires, and this court on appeal can pass on no question not thus made and presented to the trial court. (Chap. 138, Acts 33rd Leg., p. 278.) This chapter provides that we shall not reverse a case

because of an error in the charge unless an objection was made thereto at the time of the trial, this being a positive command to us, and our Constitution authorizes the Legislature to place such restrictions around the right of appeal as they deem the interest of justice and a sound public policy demands. (Sec. 5 of art. 5 of the Constitution.) However, Judge Davidson filed a dissenting opinion, in which he holds that the court erred in charging the jury affirmatively that Romero was an accomplice, and he discusses this at length. We have copied all the exceptions made by appellant at the trial, and no objection was made to the charge of the court in this respect, nor was the charge on accomplice testimony in any way questioned by appellant as the record in this court will disclose. We have read and re-read the motion for a new trial filed in the court below by appellant, and he in said motion makes no such contention. In the brief filed in this court by appellant, nor in the motion for rehearing, does appellant contend that the court erred in the charge on accomplice testimony—the only place that this question is raised is in the dissenting opinion of Judge Davidson, and his whole dissenting opinion heretofore filed herein is based on a proposition that has never been suggested nor contended for by appellant. The dissent, therefore, is based on a matter not presented in any manner, shape or form in the record before us, as is manifest by the record now on file in this court, and to consider and pass on such question we would be compelled in our opinion to go directly in the face of the law passed by the Legislature for the government of this court. Therefore, the court is not authorized to consider the proposition on which the dissent is based. However, since Judge Davidson has seen fit to raise a question, and base his dissent thereon, not raised nor discussed by appellant, and which was not presented to the trial court, we will say this much: We do not think the court erred in charging that Romero was an accomplice in law. Had he not submitted the law of accomplice testimony, reversible error would have been presented by the record, had the appellant raised that issue. Romero admitted that he engaged in the fight and cut deceased, thus showing a guilty participation on his part at least, while he by his testimony placed appellant in position to inflict the wound in the back. Romero did not deny his complicity in the commission of the offense, nor the fact that he had been indicted and convicted of the offense. The sole question in this case was: did the evidence conclusively show an acting together, an unlawful attack by appellant and Romero on deceased, both of them inflicting wounds on deceased? Appellant denied he inflicted any wound or participated in the fight. Romero says he did not inflict the wound in the back, and while he did not see appellant inflict the wound, yet that appellant and appellant alone was in position to inflict that wound. His testimony is copied in full herein. The evidence and all the evidence shows that Romero had a guilty connection with the offense charged, and the charge of the court does not assume that appellant participated therein, but after instructing the jury who are principals in the commission of an offense, instructs them to acquit

appellant, as hereinbefore shown, if they believed Andres Romero inflicted the wound that caused his death, or they had a reasonable doubt of that fact, unless they found as a fact that appellant was a principal in the commission of the offense, as principals had theretofore been defined.  The court further instructed the jury:  "In this case you are instructed that you can not find the defendant guilty upon the testimony of the said Andres Romero unless you first believe that his testimony is true, and that it shows that the defendant is guilty as charged, and even then you can not convict the defendant unless you further find that there is other evidence in the case apart from the evidence of the said Andres Romero tending to connect the defendant with the commission of the offense charged in the indictment, and then you must find and believe from all of the evidence in the case beyond a reasonable doubt that the defendant is guilty before you find him guilty."  Romero was corroborated by other witnesses who saw them go out of the saloon together by the fact that appellant's hat was picked up where Romero said he was standing, and other facts in evidence.

Take the charge as given, it is not subject to the criticisms contained in the dissenting opinion of Judge Davidson, and as no such question was raised by the appellant in the trial court nor in this court, the criticism in our opinion is wholly unwarranted and unjustified under the laws of this State, and no dissent should have been based thereon.  It is unjust to the trial judge to reverse a case, or base a dissent on grounds not presented to the trial judge, and which the appellant does not seek to present to this court for review.

The motion for rehearing is overruled.

*Overruled.*