HILARIO ALANIS v. THE STATE.

No. 4489.    Decided December 5, 1917.

**Murder—Charge of Court—Manslaughter.**

Where appellant claimed that the issue of murder did not arise from the evidence and he could only be convicted of manslaughter, and the evidence in the case, as it appeared from the record on appeal, showed that appellant's contention was correct, the judgment is reversed and the cause remanded. Prendergast, Judge, dissenting.

Appeal from the District Court of Nueces. Tried below before the Hon. W. B. Hopkins.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*Pope & Sutherland,* for appellant.—On question of insufficiency of the evidence: Walker v. State, 14 Texas Crim. App., 609; Johnson v. State, 5 id., 423; Jones v. State, 7 id., 457; Ridout v. State, 6 id., 249; Tollett v. State, 44 Texas, 95.

*E. B. Hendricks,* Assistant Attorney General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of murder and allotted fifteen years confinement in the penitentiary.

The case originated in Duval County and was transferred to Nueces County on change of venue.

It is contended the court erred in submitting the issue of murder, and the same question is also raised on the sufficiency of the evidence to show the offense of murder, the claim being that the offense from the State's standpoint was of no higher dignity than manslaughter. The proposition is practically the same, whether viewed from the standpoint of the objection to the charge or the sufficiency of the evidence. The State's case practically is that deceased,. Linton Shaw, and his brother, James Shaw, went to a house where there was a Mexican dance. They walked around the house and located themselves near a window to hear the music and avoid the crowd. A Mexican, who was not the defendant, said to James Shaw, brother of deceased, "What the hell is it to you if you don't like it?" "After my brother told him that I was crippled and that if he had anything, that he could take it up with him. Then they had a fight there; they just started striking each other; my brother hit him and he hit my brother. They hit each other with their fists. A Mexican separated them, and this Mexican, defendant, came running from somewhere, and said if those gringoes didn't behave themselves he was going to fix them." This witness testifies he and his brother, deceased, then walked over to Mrs. Hughes' residence, across the street, and remained there about twenty-five minutes; then went back to where the dance was in progress. Upon returning, the witness, who seemed to be in front of deceased, said he looked around and did not see his brother and went back around the corner of the house, and he was standing talking to Juan Alanis, Hilario Alanis, Manuel Ortiz and Esequio Rios, a deputy sheriff. Juan Alanis is the father of the defendant, and when witness reached where they were talking the first thing he heard as he walked up was that Juan Alanis, father of defendant, said to deceased that he heard he was looking for his son to kill him, and witness' brother said, "No, that is not true," and he said, "Well, I have witnesses," and witness' brother said, "Well, if you have witnesses bring them here and I will tell them that they lie." Witness then said: "When I looked around the defendant here and his father rushed on my brother, striking him with their fists, and he was backing off. He backed to where I was standing, and when he came up Juan Alanis, the father of defendant, came towards me in the attitude to strike me, and there was someone behind me. I didn't have time to look around to see who it was, and as soon as he got close enough I hit Juan Alanis, the defendant's father, with my crutch. He ducked and I hit him on the head, and just as I hit him a Mexican grabbed me from behind with my two arms, and my crutch was broken. I saw there was an officer between them, but just as they got up the moon was shining as bright as it could, and my brother holloed: 'Pick

up that gun, don't let him get it.' At that time the defendant was
striking my brother and my brother was going back and hitting him
with his fists. So Esequio Rios, a deputy sheriff, picked up the pistol."
While deceased was engaged in the fisticuff with the defendant and just
after witness struck defendant's father with the crutch, deceased called
out that he had dropped his gun, to pick it up and not let them get it.
The defendant and deceased were exchanging blows with their fists.
When this remark was made the deputy sheriff picked up the gun, "the
defendant and deceased were right together, as close as they could get,
hitting each other with their fists. They were a foot or a foot and a
half apart." "While the difficulty was going on I heard my brother
say: 'Pick up that gun.' I didn't know that my brother had a gun; he
said: "Pick up that gun !' He must have had the gun all the evening."
It is shown that the dance was at the residence of a half sister of appel-
lant. James Shaw and his brother, Linton, deceased, were not invited
to the dance. He further testified that his brother was willing to de-
fend him and offered to take care of any derogatory remarks that were
made relative to the witness, and made a statement that he was willing
to take care of anything that came up relative to witness. After this
occurred they went over to the residence of Mrs. Hughes. Shortly after-
ward, within twenty or twenty-five minutes, they returned to the place
of the dance. The deputy sheriff, Rios, testified that deceased called
out in English that he had dropped his gun and to pick it up. He
picked up the gun while these boys were fist fighting each other. The
deceased told him to pick up his pistol. Neither was advancing; they
were engaged in a fist fight. "It is true that this defendant never fired
a shot until after Shaw made this remark about his pistol. It is a fact
that the father of this defendant was lying unconscious on the ground
before this defendant fired that shot. This trouble occurred at the
house of the sister of this defendant." Another State's witness, Ortiz,
testified that the father of defendant came and complained to him as
an officer that Linton Shaw, deceased, intended to kill his son. During
that conversation deceased told Juan and Hilario that they were not
men enough to stand for what Hilario said. This witness said he
stated on the examining trial that Hilario came in in defense of his
father; and witness further testified that defendant's father stood back,
and that deceased and defendant were striking each other with their
fists, and that at that time James Shaw struck Juan, father of defendant,
on the head with a crutch. The defendant saw James Shaw strike
Juan Alanis, father of defendant, over the head. It seems the defend-
ant and deceased then began fighting when appellant saw his father hit
over the head with this crutch. This witness testified that during the
fight the parties were fighting each other with their fists.

The defendant's testimony is to the effect that deceased and defendant
came around the corner of the house first; they were striking at one
another with their fists, the crowd being back of them. The defendant
did not fall when deceased struck him; he just fell with his hand on

the ground and straightened up, and just as he straightened up he and Shaw both pulled their guns, and Shaw's pistol fell, and just as it fell to the ground defendant fired. The defendant testified when he got to where the trouble between his father and James Shaw was going on he saw his father on the ground and the deceased standing near him. Deceased then came over to defendant and started fist fighting him. He hit defendant and came pretty near knocking him down; when defendant straightened up deceased put his hand on his pistol, and defendant put his hand on his, and shot. This is the language with reference to that part of the difficulty: "I shot him because my father was lying on the ground, and I didn't know whether he was dead or alive, and he was fighting with me and had reached for his pistol, and when he did I shot him." This is a sufficient statement of the case without going more into detail, and is, we think, a sufficient illustration of the difficulty.

It was under this state of case defendant objected to the charge of the court submitting the issue of murder and the want of sufficient evidence to justify a verdict, his contention being that in no event could the offense be higher than manslaughter. Whether viewed from the standpoint of the charge or the testimony, the same result would be reached, that is, the evidence was or was not sufficient to justify a verdict for murder. We are of opinion that under this testimony appellant ought not to have been convicted of any higher grade of offense than manslaughter. The evidence shows, in a general way, that deceased and his brother were at the Mexican dance, engaged in a difficulty, went away, and came back. The deceased was armed, and the testimony indicates that they brought about the difficulty again, or whether they did or not, they came and there was a fist fight between defendant and deceased immediately following the use of the crutch by James Shaw upon appellant's father. This was a Mexican dance, and deceased and his brother were not guests or invited to be there. This was a quarrel or trouble between the parties, followed by a fist fight, and later developed into the trouble where deceased drew his pistol and appellant drew his, and a tragedy occurred. Under the circumstances we are of opinion that this offense is no higher from the strongest view of it for the State than manslaughter.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE, dissenting.