## J. A. CLAXTON V. THE STATE.

No. 9512.   Delivered October 21, 1925.

Rehearing denied to State March 3, 1926.

**1.—Murder—Charge of Court—Held, Error.**

Where, on a trial for murder, the uncontradicted evidence showing that the homicide occurred at the first meeting between appellant and deceased after the appellant had been informed of insulting words and conduct of deceased toward appellant's daughter, it was error for the trial court to charge the jury the definition of the words "first meeting." Such charge, under the facts in this case was calculated to induce the jury to conclude that the court was of the opinion that the evidence raised an issue of there being more than one meeting between the parties, and should not have been given. Following Morrison v. State, 47 S. W., 369, and other cases cited.

**2.—Same Evidence—Not Sufficient—To Sustain Murder Verdict.**

The uncontradicted evidence in this case establishes a killing on the first meeting between appellant and deceased, after appellant had been informed of insulting conduct by deceased toward appellant's daughter. No other possible motive for this killing is raised by the evidence. While we do not want to be understood as saying that the evidence may not be strong enough to support a conviction of murder, we have serious doubts as to whether or not appellant is in fact guilty of a higher offense than manslaughter.

ON REHEARING.

**3.—Same—Charge of Court—Defining "First Meeting"—Erroneous.**

On consideration of a very able motion for rehearing by the state presented by the district attorney who tried the case, we are unable to agree with him that we were in error in our original opinion in holding that it was error for the court to charge on the definition of "first meeting." Viewing the charge in the light of the present record, we are of the opinion that the disposition made of the case upon the original hearing was a proper one, and the motion for rehearing by the state is overruled.

Appeal from the District Court of Milam County. Tried below before the Hon. John Watson, Judge.

Appeal from a conviction of murder, penalty 25 years in the penitentiary.

The opinion states the case.

*Henderson, Kidd & Henderson* of Cameron, for appellant.

*Sam D. Stinson,* State's Attorney, and *Nat Gentry, Jr.,* Assistant State's Attorney, for the State.

BERRY, JUDGE.—The appellant was convicted in the District Court of Milam County for the offense of murder and his punishment assessed at confinement in the penitentiary for a term of 25 years.

The facts show that the appellant killed the deceased McAlpine and at the same time and place killed one Junek. The killing occurred at the home of the deceased McAlpine. The appellant, McAlpine and Junek lived in three different houses situated along a certain road in Milam County within an aggregate distance of something like five hundred yards. Near these houses, one Jess Gunn lived, he being a tenant of the deceased Junek. In going from Cameron in the direction in which the parties lived, one first passed the home of Jess Gunn and the next house was McAlpine's, the third Junek's and the fourth the appellant's. McAlpine's house was 205 steps from Gunn's house. Junek's house was 270 steps from McAlpine's house and the appellant's house was 275 steps from Junek's. The record discloses that on the day of the homicide about 9:30 or 10:00 o'clock, Vera Claxton, the 19-year-old daughter of appellant, went to the mail box and in doing so went by Gunn's home. It also discloses that Jess Gunn's wife, Carrie Gunn, was the daughter of the appellant. When Vera Claxton went by Gunn's home on the day of the homicide she found her sister, Gunn's wife, at home, crying, nervous and jerky and upon being asked the cause of her condition, she told the witness Vera Claxton that Junek and McAlpine had been down to her house and had abused and cursed her, telling her not to use any more water out of the cistern. Mrs. Gunn told her sister, Vera, tat she was standing between the cistern and the house where she had a tub and that Junek and McAlpine drove up and that Junek said, "you black son of a bitch, if you don't get out of the way I will run over you," and that she moved over and he stopped the car and told her, "by God, I have come to stop you sons of bitches from using water out of the cistern for washing or drinking or anything," and asked her where her husband was and she told him that he had gone off on some business and he said, "well, when I hire a man I want him to work instead of running around over the country," and she further told her sister that McAlpine said, "you son of a bitching people are not fit to live in a white man's house and ought to be

throwed out on the roadside"; and she further told her sister that Junek started to get out of the car and put his foot out but never did get out of the car and said, "if I get out of this car I will shoot you, you black son of a bitch, that is what I will do." And that McAlpine said "that son of a bitch Jess has been telling lies off on my family" and Junek said "if I see you around that cistern any more or drawing any water out of it I am going to kill you." And that when they started off Junek said, "when that son of a bitch Jess comes home tell him I want to see him." The witness Vera Claxton further testified that she returned home at once and told her father what her sister Carrie Gunn had informed her as to what the deceased McAlpine and Junek had said to her and told her father that her sister Carrie had told her to tell him to come up and stay with her until her husband came back, on account of the fact that Junek and McAlpine had been down there cursing and abusing her. At the time this information was conveyed by Vera Claxton to her father, her testimony shows that he was in the field plowing near his house and that he immediately went in the house and got his gun and started on down towards the scene of the difficulty. Upon his arrival at the home of McAlpine, the record discloses that both McAlpine and Junek were sitting on the front porch. The appellant's conduct is described at the scene of the killing from the state's standpoint by the witnesses Majorie Beckham, Floyd Beckham and Mrs. J. M. McAlpine. Majorie Beckham testified as follows on this point:

"I saw Mr. Claxton coming up to the house from the direction of his house. He had a gun in his hand. He was coming up the steps and Daddy pushed him back and said he didn't allow guns in his house and he said he was coming in anyhow; then Daddy went in the house. He took the little children in the house with him; Mr. Junek went in the house too. I stayed out on the gallery. Then Mr. Claxton just shot through the door; that was the door close to the road. I did not see my mamma there anywhere before he shot. When he shot through the door there was no one else on the gallery except me and Mr. Claxton. My papa had gone before he shot through the door. He shot Mamma and Mr. Junek; then he went on in the house; I went in the house too. When I went in the house I saw my mamma in there; she was standing in the door between the bed room and the front room. I saw my papa come in the house then; he came from outside the back somewhere. I did

not see Floyd. After papa came in I did not see ·Mr. Junek; Mr. Claxton shot daddy; that is all I saw him shoot, Daddy. I did not hear him say anything before he shot daddy. Daddy was going towards mamma when he shot him; Mr. Claxton shot and daddy run on the porch and fell from the porch. I heard daddy say "you shot my wife"; he was talking to Mr. Claxton; that was before he shot Daddy; then Mr. Claxton shot daddy. I do not know where Mr. Claxton went then."

Floyd Beckham's version of the affray was as follows:

"I saw Mr. Claxton coming up toward our house; I did not see his gun at first, but Martin did and he said that man has got a gun, and I looked and saw Mr. Claxton; he was coming from the direction of his house; he was walking. After we saw him coming we went in on the front porch. Martin told them that man was coming with a gun. They didn't do nothing then; Mr. Junek asked Papa if he had a gun and Papa said no. By that time Mr. Claxton had got up by the house; he had a gun; it looked like that one (indicating gun). Mr. Claxton came on in the yard; he came up to the porch and said to Junek, "God damn you I am going to shoot you" and Junek and Papa run in the house and Junek shut the door and Papa run out in the back yard with the two little girls to hide them in the chicken house, and Mr. Claxton shot through the door and shot Mamma and then I went out in the back yard and Mr. Claxton come around there and Papa said "don't shoot no more" and he said "where is Junek" and Papa said "I don't know where he was" and he said "I will find him" and he went back in the house. Mr. Claxton went back in the house and Papa and I went in behind him and Papa saw Mamma was shot and he said "Claxton you have shot my wife" and he said "Yes sir and God damn you I will shoot you too" and he shot him, and then he went in the back yard to shoot Mr. Junek. The chicken house is situated on the far side of the house five or ten feet from the corner. When Mr. Claxton shot through the front door I was standing in the door that separates the two. rooms inside the house, mother and Mr. Junek were in there then. * * * When he shot through the door. I went out the back where Papa was; after that shot Mr. Claxton came back in the back where Papa and I were. That is when he had the conversation. Mr. Claxton did not shoot any out the back when he first came back there. After he had this conversation with Papa he went in the house; Papa and I went in right behind Mr. Claxton. When we got in the house Mamma was standing in the back room;

that is the little side room. * * * Mr. Claxton shot at Papa three times in the house. I saw Papa fall; he fell from the front porch out in the yard. I do not know where Mr. Claxton went then."

Mrs. J. M. McAlpine, the wife of the deceased, gave the following version as to how the shooting occurred:

"I thought the wind had blowed the North front door open, I went to close it, and I went in there and somebody told me to look out for the gun and I raised my eyes at the same time and I taken hold of the point of the gun. Mr. Junek was standing behind the door at that time, and I pushed the gun back and said "Mr. Claxton don't come in the house with the gun." I do not remember exactly whether the defendant was standing on the porch or right inside the door. It was not such a long gun he had about this long (illustrating). It looked like that gun the best I can remember. * * * I shut the door but didn't lock it and he pushed the door open and stuck his foot inside the door just enough I reckon to keep it from closing tight and then he fired through the door. He fired through the door and the bullet struck me in the side here and went through my body and come out about here (indicating). I remember then Mr. Junek catching me as I staggered back and helped me get to the middle door and then he departed; Mr. Junek departed out of my sight and I do not remember seeing him any more. * * * The next I remember was when Mr. Claxton and my husband came in about the same time at the back door; I do not remember whether Mr. Claxton had ever been out of the house or not, but anyway they came back in my sight at the same time and my husband said to him "you have shot my wife". He was talking to Mr. Claxton. He said to Mr. Claxton "you have shot my wife" and he said "Yes sir" and he turned the gun on him; my husband did not have any gun or anything; he was not trying to get to the defendant or trying to get a gun or anything. We never had a gun in the house. When Mr. Claxton began to shoot at my husband, my husband ran out; the defendant fired at him three times. I do not know which shot hit my husband, but he hollered "Oh" when the first shot fired. I seen my husband when he fell in the yard; he never did get up. I do not know where the defendant went to then. I do not know where Mr. Junek went but they found him out in the garden."

The facts, we think, affirmatively show that there had been no ill feeling prior to this time existing between either deceased

Junek and the appellant or between the deceased McAlpine and the appellant. On the contrary, the record affirmatively shows that they had up to this time been on perfectly friendly terms. The record further discloses the fact that the appellant was armed with a 44 repeating Winchester and that the time elapsing between the moment when he reached the house of the deceased and that when the deadly work had been finished was very brief, not amounting to more than a few minutes.

Appellant complains because the court gave in the charge to the jury a definition defining the words "first meeting." After the court had instructed the jury that if the appellant prior to the time of the killing of the deceased received information from his daughter, Vera Claxton, that the deceased had used insulting words or had been guilty of insulting conduct toward Carrie Gunn, a daughter of the defendant, and that the defendant believed said information to be true and that such information produced in his mind either of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection, and that acting under the influence of either of said emotions of the mind known anger, rage, sudden resentment or terror rendering it incapable of cool reflection or in case of a reasonable doubt thereof, he shot and killed the deceased J. M. McAlpine, at his first meeting with McAlpine after receiving said information, then the defendant would be guilty of no higher degree of homicide than manslaughter. The court followed this charge on manslaughter with the following instructions:

"You are further instructed that the words 'first meeting' between the defendant and the deceased as used in this charge, signify and mean the first meeting of the defendant and the deceased wherein the said parties are brought into such proximity as would enable the defendant to act in the premises and after the defendant had formed a belief, if you find from the evidence he did form such belief, that the deceased had used insulting words or had ben guilty of insulting conduct toward Carrie Gunn, a daughter of the defendant."

Many pertinent objections were urged to the giving of the paragraph of the charge above quoted. Among them was one to the effect that the undisputed testimony showed that the meeting at the scene of the killing and at the time of the killing was the first meeting between the appellant and the deceased after he had learned of the insulting words and conduct of the deceased toward his daughter, Carrie Gunn, and it

is appellant's contention that the court in defining the words
first meeting under these facts impressed the jury with
the view that the court was in doubt as to whether or
not, under the facts detailed above, it was a first meet-
ing between the parties at the time the killing occurred. It
may be conceded that the charge given defining the words first
meeting is correct as an abstract proposition and did the facts
raise an issue as to the question of a first meeting, it might
not be improper in some cases to give this charge. But under
the peculiar facts of this case, we are led to the conclusion that
the giving of this charge was probably prejudicial to the appel-
lant's defense. Under the facts in this case, we think this
charge was likely, and calculated to induce the jury to conclude
that the court was of the opinion that the evidence raised an
issue as to there being more than one meeting between the par-
ties under the evidence in this case. We cannot agree with
the trial court's view concerning this matter, but on the con-
trary, we think under all the authorities in this state, that this
testimony clearly shows that the killing occurred on the first
meeting of the parties, after appellant had been advised of the
insulting words and conduct of the deceased toward his daugh-
ter. Morrison v. State, 47 S. W. 360; Niland v. State, 19 Tex.
Crim. App. 166; Eanes v. State, 10 Texas Crim. App. 421.

In discussing the question of a first meeting, Judge Hender-
son in the Morrison case, supra, held that where the facts
showed that the appellant was informed on the night of the
killing that his wife was to meet deceased at a certain house
where deceased was working and he went to the premises and
saw his wife in the room with the deceased and that he got under
the house and under the room of the deceased and after a
while heard deceased come in the room and heard deceased
and his wife on the bed in the room and heard them copulating
and that he heard them get up off of the bed and he got about
thirty-five steps and saw deceased and his wife come out of
the room together and went around another way and intercept-
ed the parties and came back behind them and that the shooting
then began after the deceased had started to run on to him,
that the killing under those circumstances occurred at the
first meeting of the parties. He further held that under the
law, the defendant was not required to fire upon the deceased
as soon as he emerged from the door in order to avail himself
of his defense under the theory of manslaughter.

In the instant case, it seems certain that appellant immedi-

ately on approaching the house where the deceased and Junek were, began firing and it is also evident from the testimony that he did not cease firing for any appreciable time at either Junek or the deceased, until they were both slain. It is also evident that the same purpose and motive that animated the appellant to act against McAlpine also existed in his mind as against the deceased Junek, and the fact that his attention was first directed to the killing of Junek would not make his killing of McAlpine one done on a second meeting, whereas, in this case, the evidence seems to be undisputed that McAlpine remained in and around the house the entire time the shooting was going on and when the time consumed in the entire efforts to slay could not have been but a very few moments. We think the charge defining a first meeting was not called for by any dispute as to the facts and we are convinced that it had a strong tendency to confuse the jury and to impress them with a view of the case not raised by the testimony.

The views we have expressed are confirmed by the fact that we have had great difficulty in deciding that the jury was warranted under the facts detailed in finding the appellant guilty of a higher grade of homicide than manslaughter. It seems to be settled in this state that proof of motive for a homicide is not indispensable to a conviction, but in this case the only motive shown for a homicide would, if true, reduce the same to manslaughter and there is no evidence indicating other than a manslaughter state of mind and hence we certainly question the propriety of permitting a verdict to stand for a higher degree of homicide. This record seems to be entirely silent of any suggestion of a motive other than that of the insult to the appellant's daughter. In fact we think it affirmatively shows even from the state's standpoint, that there was no other motive for this killing. As has been said by this court in a case where the facts are very similar, we are not to be understood as saying that the evidence may not be strong enough to support a conviction for murder but that the mind of this court upon an examination of this record is left in such condition that we are desirous that the evidence should be passed upon again by another jury. Maddox v. State, 254 S. W. 800; Alanis v. State, 200 S. W. 169; Fox v. State, 253 S. W. 294; Doss v. State, 67 S. W. 321; Stewart v. State, 106 S. W. 685.

From what has been said it follows that in our opinion the judgment of the trial court should be reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—We have examined the very carefully prepared and elaborate motion for rehearing presented for the state by the district attorney who tried the case. The zealous manner in which he has pursued the matter is commended.

However, we are constrained to the view that under the evidence· in the present case, a definition of the term "first meeting" was not demanded. Defining the term was calculated to mislead the jury. The court having determined to give the charge and having embraced it in his main charge, it would have been appropriate that he accede to the appellant's request to give to the jury further information upon the subject by reading one of the special charges requested. In one of these charges, the request was made to tell the jury that it was not necessary that the killing occur "instantly upon the first meeting of the parties." In the opinion of the writer, however, the definition of the term should not have been attempted. The term "first meeting" is not ambiguous or technical, and its application to a state of facts such as those in the present case where the homicide took place a few moments after the parties came in view of each other and before they separated and where the assailant was armed and displayed his hostile intention and began to put it into effect immediately upon coming in the proximity of the deceased and continuously pursued his purpose, is a matter that should be left to the jury.

The statute declares insulting words or conduct towards a female relative adequate cause to render the mind of the slayer incapable of cool reflection, when the homicide takes place upon the first meeting after he learns of the insulting words or conduct. Arts. 1248 and 1249, P. C. In an instance where the evidence pointed with less cogency to such insulting words or conduct as the sole cause of the tragedy, a charge defining

the term "first meeting", though uncalled for, might not be ground for the reversal of a conviction of murder. Viewing the charge in question in the light of the present record, however, we are of the opinion that the disposition made of the case upon the original hearing was a proper one.

The motion for rehearing is overruled.

*Overruled.*