SANTOS VILLAREAL v. THE STATE.

No. 21069. Delivered December 4, 1940.
Rehearing Denied January 22, 1941.

676

The opinion states the case.

*John A. Pope, Jr.,* and *L. R. Brooks,* both of Rio Grande City, and *Bismark Pope,* of Laredo, for appellant.

*J. T. Canales,* of Brownsville, amicus curiae.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

The motion for rehearing in this case is granted and the original opinion herein, dated May 15, 1940, is withdrawn and the following substituted in lieu thereof.

Upon a trial for murder in the district court of Starr County, the appellant, Santos Villareal, received the death penalty, his victim being Flavio Hinojosa. Both parties are Mexicans. All the pertinent facts took place during a drinking revelry one night in which the principal actors were the appellant, Armando Gonzales, Macerio Barrera, and deceased.

Armando Gonzales, who was present at all times with the appellant and the deceased, was the State's principal witness, and the appellant himself signed a voluntary confession which embraced the greater part of his testimony given on the stand in his own behalf.

The story of these events up to and including the finding of the body of the deceased on the following afternoon is a strange and uncanny enactment for the average Texas community, but apparently not so unusual from the standpoint of the parties involved.

Appellant is an alien, having crossed the river from Mexico, where he was born and reared, without a passport some few months prior to the date of the homicide. He first worked for the deceased for a period of forty-six days, but had not received his pay therefor. The matter had been discussed between them in apparently a deliberate manner and the deceased had made promises about when he would be able to pay, while the appellant insisted that he needed his money. No difficulty, however appears to have arisen prior to this time over the matter and there is no evidence of the existence of any strong feeling between them. Appellant had subsequently worked for different

parties, but at the time was sleeping in a small shack at or near the home of Fidel Gonzales.

Armando Gonzales and the deceased met on the evening of September 1, 1938, and, after a conference, went to the home of Fidel Gonzales to see appellant. The deceased stopped some distance away and sent Armando to his shack to tell appellant that Flavio wanted to see him. Appellant went with him to Flavio and the three of them left the place together. They stopped at some place on the highway and Flavio, the deceased, departed from them, going away in a passing truck. No dispute had arisen between any of the parties at this time and defendant returned to his shack. Soon thereafter Armando Gonzales came across the deceased at the home of Macerio Barrera. Flavio inquired for the appellant. They then left for appellant's shack and when they reached the premises the deceased again sent Armando to the shack for the appellant, who replied to his request, "Tell Flavio I will not go. We will fix matters tomorrow." When this word was transmitted to the deceased he proceeded to the shack and persuaded the appellant to go with them. They next went to the home of Macerio Barrera. They joined other parties for a part of the time, got another horse and proceeded to different places where they were drinking and dancing to a late hour in the night. No difficulty of any consequence seemed to have taken place.

While at one place appellant and Armando Gonzales were dancing together and Santos punched Armando with his knife, which caused Armando to quit dancing and go to himself to one side. Deceased came up and inquired what caused him to be to himself and, upon being informed of the fact, he struck the appellant on the brim of the hat. No difficulty resulted from this, and the conversation turned into other matters immaterial to the case.

In proceeding from one place to another the appellant and deceased were riding one horse, the latter in the saddle and the former behind him, while Armando and Macerio were on another in front of them. As they proceeded, leaving the home of Santos Canales, Armando noticed that appellant was trying to check the reins of the horse on which he was riding, and Flavio was protesting that he was the owner of the horse and that Santos was all right. Finally Armando stopped and asked them to come on. At this time he heard Flavio reminding the appellant that he had taken him into his house and cared for him while he was sick for a month, paid his doctor bill, paid for the

medicine, saying, "And still you want me to pay you a nickel." They listened for a time and heard a struggle between the parties. He heard no words while they were struggling. Armando and Macerio soon thereafter saw the body of Flavio beside the road near some cactus. Appellant had left and Flavio was dead. Armando and Macerio went to their homes and went to sleep without telling anyone what had occurred.

The foregoing is a résumé of the facts as given by the State's principal witness and is not inconsistent with the other evidence in the case, including the statement of appellant himself, whose voluntary statement in part was offered by the State. Appellant also took the stand and detailed events of the night which are not inconsistent with the State's evidence, but, in addition, he does testify as to the difficulty; that they were off of the horse rolling cigarettes when the deceased came and put his arm around his shoulders and asked if appellant wanted him to pay him. To this appellant says that he replied that he did because he needed the money. To that he testifies that deceased said, "I am not going to pay you; you got a chingado," and twisted his arm, throwing him down. With that the struggle began and, finding the deceased had the best of him because of appellant's left hand being out of commission, appellant got his knife out and stabbed Flavio, who was on top of him choking him. He said he thought that Flavio was going to kill him; that he told him he was. He doesn't remember how many times he cut him, but when he did the deceased released him and appellant made his escape. He wandered about, lost for a time and arrived at his shack about 8 o'clock in the morning, when he entered it and went to sleep. The horse which the deceased and appellant were riding joined the other horses and came up in the early afternoon. Upon finding blood on the horse and saddle, an investigation started which resulted in Armando Gonzales leading the parties to the body of the deceased and then the arrest of appellant in his shack.

Dr. N. J. Rodriguez testified as a physician in behalf of the State that he examined the body of deceased and found several wounds on it. There were bruises on his face and that his breast was skinned, from which the doctor concluded that he had been dragged on the hard ground. One stab wound on the left side below the shoulder blade did not penetrate very far. In another place there was a small stab wound on the left side. The other wounds were described, the principal one being on the left side which penetrated the heart and produced death. The

doctor described some of the wounds and concluded that they, "appeared to be produced by dragging the body along the surface." Referring to the fatal wound, he said, "that wound could only have been produced by a right handed man from behind; he was cutting from behind. In my opinion his death was caused by the wound under his left nipple."

It is the State's theory that appellant stabbed his victim while riding on horseback behind him, reaching around with his right hand. It is indicated by other evidence that the parties fell to the ground in some sand by the side of the road and that appellant dragged his victim over the hard ground to the place where the body was found. Reliance is had on these facts and circumstances to support the finding of the jury on the issue of malice. These findings are essential to support the penalty assessed.

The conclusion of the doctor as to the position of the parties at the time of the infliction of the fatal wound is testimony on the very issue which the jury was called upon to decide and was inadmissible. No objection was made to it and no bill is presented on the subject. Consequently, it is not within the power of this court to exclude it, but it is properly within the province of this Court to consider its probative force on the issue of malice where the contention is made that the evidence is insufficient to sustain the jury's finding and the assessment of the death penalty.

The appellant had testified that he was on the ground and that the deceased was on top of him with his arm around his neck choking him; that he cut for the purpose of extricating himself from what he feared to be a death grip. The doctor's conclusion seems to be in conflict with this testimony and must have been so accepted by the jury and by them considered as evidence of greater value than that given by the appellant. Ordinarily the jury may so decide, but we doubt that the conclusion of the physician as to the position of the parties is sufficient to prove the existence of the facts beyond a reasonable doubt in this particular case, and in view of all of the facts and circumstances which are without dispute. At least, we prefer that another jury pass on such of it as is admissible. This is no new position for the court to take. In Claxton v. State, 280 S. W. 832, at page 835, we find the following: "As has been said by this court in a case where the facts are very similar, we are not to be understood as saying that the evidence may not be strong enough to support a conviction for murder, but

that the mind of this court upon an examination of this record is left in such condition that we are desirous that the evidence should be passed upon again by another jury. Maddox v. State, 254 S. W. 800, 95 Texas Cr. R. 429; Alanis v. State, 200 S. W. 169, 82 Texas Cr. R. 391; Fox v. State, 253 S. W. 294, 95 Texas Cr. R. 220; Doss v. State, 67 S. W. 321, 67 S. W. 551; Stewart v. State, 106 S. W. 685, 52 Texas Cr. R. 273."

Again, in Powell v. State, 28 S. W. (2d) 142, this Court approved an opinion from which we quote: "We entertain such grave doubt as to the sufficiency of the evidence that we feel that the case should be passed upon by another jury."

While the distinction between express malice and implied malice is not now made as formerly (Stephens v. State, 245 S. W. 687), and the jury may assess the death penalty where the facts and circumstances warrant the implication, yet, it is within the power of this court to reverse a case on the facts and it may become its duty to do so, (Art. 848 C. C. P.). It would seem that this doctrine is applicable on one issue as well as upon all of the facts of the case taken as a whole, provided the case turns on that issue, and it is proper to consider the entire record with each and every fact which throws light on the subject in determining the force of the evidence on any particular issue. This we have done, and as we now view the record we are unwilling to permit the verdict assessing the death penalty to stand.

In reaching our conclusion in this case we have not overlooked the general rule, frequently announced, that the credibility of witnesses and the weight to be given their testimony exclusively rests with the jury and the lower court. Further, that this court will not pass on the sufficiency of the evidence unless there is an entire failure of proof; and that the amount of punishment is the jury's special province. However, we do find that this court has upon occasions applied such rules with a degree of laxity where, under the facts of such cases, it appeared that the conviction was unjust or that the punishment was harsh or unreasonable. We are convinced that for these questions there can be no fixed rule so firmly planted that it cannot be, under a proper state of facts, varied.

Judge Morrow made a very wholesome announcement in Taylor v. State, 221 S. W. at page 613, as follows: "While this court has the right to reverse a judgment of conviction on account of the insufficiency of the evidence (Texas Code Crim. Procedure, Art . 939), and it becomes its duty to do so 'if the

guilt of the accused is not made to appear with reasonable certainty' (Mitchell v. State, 33 Texas Cr. R. 577, 28 S. W. 475), *no fixed rule has been devised which will in all cases furnish a certain standard. Necessarily each case must, in a measure, be tested by its own facts* (Mitchell v. State, 33 Texas Cr. R. 577, 28 S. W. 475; Hampton v. State, 1 Texas App. 652; Burrill on Circumstantial Evidence, p. 737; Wills on Circumstantial Evidence p. 188). However, when a jury, advised of the restrictions which the law places upon them in condemning one on circumstantial evidence, reaches the conclusion upon evidence *properly before them* that the accused is guilty, it is not for the reviewing court to supplant their findings by its own, *unless it is able to* point to *weaknesses, omissions,* or *inconsistencies* in the evidence which destroy its cogency."

It requires no unreasonable degree of consideration of the facts of this particular case to recognize the "weaknesses," "omissions," and "inconsistencies." In a human consideration of this record we must conclude that such weakness of the evidence does affect the cogency of it. We are not able to say that this doctrine should apply in the matter of determining guilt and deny it in the consideration of the amount of punishment which a jury assesses. It is no new thing for this court to consider the competence of evidence in determining its cogency, particularly where the extreme penalty has been assessed. (Tex. Digest, Vol. 13, page 959; Zollicoffer v. State, 16 Texas App. 312). The fact that incompetent evidence has been admitted without objection renders its admission harmless, but may not always lift its forcefulness to a superlative degree, or, indeed, add materially to its cogency.

Complaint is made because of the admission in evidence of the incident while the men were dancing, wherein Armando Gonzales was punched with a sharp knife by appellant, which was followed by the inquiry made by the deceased and his striking appellant's hat brim. The apparent purpose of this testimony seems to be to show that Santos is a bad man, a knife swinger, a wanton killer, perhaps. Such may not be proven against him. Furthermore, this appears to be nothing more than a slight reprimand, even if so intended, and it apparently caused no difficulty between the parties. They left immediately in a friendly mood and there is no evidence of it ever being mentioned between them again. Consequently, it is a separate and distinct matter wholly disconnected from the tragic event, and we are unable to see any purpose it could serve as evidence in the case. It does not appear as evidence sufficiently harmful to warrant a

reversal of a case, but it is not pertinent and in view of the penalty assessed we may properly have doubts about it. The exception to this evidence should have been sustained. (Branch's Annotated Penal Code, Sec. 166; Woodard v. State, 51 S. W. 1122; Lawrence v. State, 82 S. W. (2d) 647; Glover v. State, 69 S. W. (2d) 136.)

The motion for rehearing in this cause is granted. The judgment of the trial court is reversed and the case remanded for a new trial.

### ON STATE'S MOTION FOR REHEARING.

CHRISTIAN, Judge.

After carefully re-examining the record in the light of the State's motion for rehearing, we are constrained to adhere to the conclusion expressed in the original opinion.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.